*This opinion is subject to revision before final publication in the Pacific Reporter*

**2019 UT 54**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent*,

*v.*

ROBERT S. APODACA,
*Petitioner*.

No. 20180673
Filed August 29, 2019

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Randall N. Skanchy
No. 121911274

Attorneys:

Sean D. Reyes, Att'y Gen., John J. Nielsen, Asst. Solic. Gen., Nathan Evershed, Salt Lake City, for respondent

Lori J. Seppi, Salt Lake City, for petitioner

JUSTICE HIMONAS authored the opinion of the Court in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE, JUSTICE PEARCE, and JUSTICE PETERSEN joined.

JUSTICE HIMONAS, opinion of the Court:

### INTRODUCTION

¶1 Robert Apodaca asks us to reverse the court of appeals' affirmance of his convictions for aggravated kidnapping, aggravated robbery, and obstruction of justice. He contends that the court of appeals erred in affirming the trial court's conclusion that his confession and other incriminating statements made to police would have been admissible at trial as impeachment evidence, despite an acknowledged violation of his *Miranda* rights, which barred the statements from being used in the State's case-in-

chief. Additionally, he contends that the court of appeals erred in affirming his conviction for aggravated robbery in the face of a faulty jury instruction that improperly recited the requisite mental state for the offense.

¶2 The court of appeals—following the standard we set forth in *State v. Arriaga-Luna*, 2013 UT 56, ¶ 9, 311 P.3d 1028, which echoed the United States Supreme Court's ruling in *United States v. Washington*, 431 U.S. 181, 188 (1977)—properly surveyed the totality of the circumstances surrounding the statements made by Apodaca and held that Apodaca's free will was not overborne in making them. We agree. Apodaca's confession and statements to police were not coerced and would have been properly admissible against him as impeachment evidence if he had chosen to testify. Furthermore, although the jury instruction given at trial was faulty as to the proper *mens rea* required to convict Apodaca of aggravated robbery, we also agree with the court of appeals that it did not result in prejudice to Apodaca. Accordingly we affirm the decision of the court of appeals in its entirety.

## BACKGROUND

### *The Crime*

¶3 Apodaca's co-defendant Brandon Montoya testified at trial that on November 28, 2012, he had purchased a small amount of oxycodone pills from J.H.,[1] a sixteen-year-old drug dealer. Later that same day, Montoya raised the idea of robbing J.H. with Apodaca. Montoya testified that he contacted Apodaca because Apodaca had a car and that he asked Apodaca to bring a gun or someone with a gun so J.H. would "give [the drugs] up without a fight." Apodaca agreed to the plan and promised to "bring one of his homies."

¶4 Montoya then called J.H. to arrange to purchase a large quantity of oxycodone pills. Montoya testified at trial that, according to their plan, he, Apodaca, and Gilbert Vigil would drive to J.H.'s house and ask to do the drug deal in Apodaca's car. The plan was that once J.H. was in the car, Vigil would "just pull out the pistol and scare him, make him give the pills up, and then kick him out of the car." Montoya would feign surprise and encourage J.H. to cooperate.

---

[1] Because the victim was a minor at the time of the events at issue, we refer to him as J.H.

¶5    Montoya, Apodaca, and Vigil arrived at J.H.'s girlfriend's home and asked J.H. to do the drug deal in the car. J.H. got into the backseat of the car. As J.H. counted the pills, Apodaca sped off. Vigil struck J.H. in the head with a .22 caliber revolver, then pointed it at J.H.'s head and demanded, "Give us those fucking pills."[2] As this happened, Montoya screamed, "Give them the pills. . . . I don't want to die." J.H.'s pleas to be let out of the car were ignored and he was unable to open the door while the car was in motion. J.H. attempted to get the gun from Vigil, but Vigil shot him in the stomach and multiple times in the legs. Apodaca then stopped the car, and Montoya and J.H. got out while Apodaca and Vigil drove away. Police arrested Apodaca after finding his car, which had blood stains, a wet backseat, and missing floor mats.

*Apodaca's Interview*

¶6    Apodaca's interview with two detectives occurred in three distinct segments. The first segment, a conversation between Detective Martell and Apodaca in the squad car, was recorded. The second segment, which was not recorded, occurred while Detective Jensen transported Apodaca from the squad car to the interview room. The third segment, which was recorded, was conducted by both detectives in an interview room at the police station.

*The First Segment*

¶7    At the beginning of the first segment, which was recorded in the squad car, Detective Martell told Apodaca he would explain his rights to him. Apodaca replied, "After you give me my rights though don't ask me no questions cuz I answering no questions bro." Detective Martell recited Apodaca's *Miranda* rights and acknowledged that Apodaca had invoked his right to remain silent. He then told Apodaca that he would give him "the opportunity to tell . . . [his] side."

¶8    Apodaca denied any wrongdoing and asked whether he was "going to jail [that night] no matter what." When Detective Martell replied that he did not know whether Apodaca was going

---

[2] At trial, J.H. expressed some confusion about whether it was Apodaca or Vigil who demanded the pills. On cross-examination, J.H. conceded he could not recall who made the statement and that it was possible that both Apodaca and Vigil demanded the pills. Additionally, both J.H. and Montoya testified that someone said to "pop" or "shoot" J.H. but it was disputed as to whether this someone was Apodaca or Vigil.

to jail, Apodaca said, "How can I not go to jail, you guys got to start making me feel more comfortable, cuz I could help anybody as long as I'm gonna get something in the process." Apodaca consistently expressed his desire to make a deal and said that he would not incriminate himself or anyone else without getting "someone [to] tell [him] you ain't going to jail." Detective Martell said he could not make a deal, but encouraged Apodaca to talk to him because, unlike the other detectives, he understood Apodaca's background and his "hard life." Apodaca again said that he would not talk "unless [he was] getting some deals." Additionally, Apodaca said, "How about you ask them what it's gonna take for me not to go to jail and maybe I can tell them these things if they're gonna guarantee me to not go to jail."

¶9　Detective Martell later told Apodaca, "[T]here's no way that you're not going to jail tonight." Apodaca then asked whether the interview was being recorded. When the detective replied that it was, Apodaca indicated that he would be willing to disclose more information if the recorder was turned off. Apodaca then expressed his understanding that the detectives would add charges against him if he did not give a statement. Detective Martell replied, "No dude that's not how we work . . . it's not up to us okay? . . . It's up to the prosecuting [attorneys] to make a decision." Before Detective Jensen took custody of Apodaca, Detective Martell asked Apodaca if he was sick or injured, to which Apodaca replied, "I'm pretty sick to my stomach and I'm gonna need my methadone soon in the morning . . . . [W]hen I don't have that I can't even function." Apodaca was then transported from the police car to the interview room.

*The Second Segment*

¶10 Because Detective Jensen and Apodaca conversed in the forensic area while Apodaca was being transported, there is an unrecorded "second segment" of his interview with police. The trial court heard testimony from Apodaca and Detective Jensen about the content of this unrecorded conversation. According to Apodaca, he invoked his right to remain silent during the first segment, but changed his mind and decided to waive his rights because of the exchange he had with Detective Jensen in the second segment. Apodaca said Detective Jensen told him that if he explained what happened, Detective Jensen would "write the DA and . . . make sure that [Apodaca would be] out by Christmas Day." Apodaca testified that he understood this as a "guaranteed" promise that he would be treated with leniency if he cooperated.

He testified that if he had not received this promise, he would not have talked to police.

¶11 According to Detective Jensen, "no deal was ever made" during the second segment of the interview, and he did not give Apodaca "any definite answers about jail or Christmas." Detective Jensen testified that he "struck up a conversation" with Apodaca about tattoos in the forensics area of the police station after Apodaca became upset when he overheard Detective Jensen telling a technician that Apodaca may be charged with attempted homicide. Apodaca asked about the charges and expressed that he was "concerned about going to jail" and "did not want to snitch." Detective Jensen told Apodaca that "now was a good time to cooperate if he was willing to do it."

¶12 According to Detective Jensen, Apodaca expressed concern that "his cooperation would not get back to the prosecutors in charge of his case," so Detective Jensen told Apodaca that if he decided to cooperate, he, Detective Jensen, "would let the prosecution know that he decided to cooperate and take responsibility." The detective testified that when he said he was giving his word to Apodaca, he was only reassuring Apodaca that he would pass along the information about Apodaca's cooperation to the prosecuting attorneys.

*The Third Segment*

¶13 The third segment took place in an interview room with Detectives Martell and Jensen and was recorded. The interview transcript begins with the following exchange:

> [Apodaca]: I just hope that prosecuting attorney sees how much I'm giving up.
>
> [Det. Jensen]: I guarantee they will.
>
> [Apodaca]: I just hope I get out.
>
> [Det. Jensen]: Hey you've got my word alright.
>
> [Apodaca]: That would be the shit if I was out by Christmas man.
>
> [Det. Jensen]: No I hear ya.

¶14 After Detective Jensen repeated Apodaca's *Miranda* rights, Apodaca began making incriminating statements but did not identify the shooter. Detective Jensen told Apodaca that he already knew "everything" but was giving Apodaca "a chance to let [him] know [what happened]" because "it always looks better if you

cooperate." Apodaca then told his story, which involved admitting to the plan to rob J.H. of a "big amount" of pills and his function as getaway driver. He also admitted to knowledge of the portion of the plan involving scaring J.H. with a gun, and talked about his own actions cleaning out his car and disposing of evidence. Apodaca expressed reluctance to identify the shooter, explaining, "I guess I have to go to jail because . . . I can't do that man. It's gonna be me on the paperwork snitching on my homeboy." Apodaca also expressed concern that he would be in danger when he was released from jail if he identified anyone. Detective Jensen assured him, "When you get out . . . [if] you feel like you're in jeopardy you need to call me and I will take care of it."

¶15 Detective Martell entered the room and encouraged Apodaca to cooperate but said, "I can't guarantee what's going to happen in court, but I, I could tell you that it's gonna be helpful to know that you're being cooperative, and that's all we're trying to do here is give you the opportunity to do so." Apodaca asked if his cooperation would "make [him] go home faster" and Detective Martell responded, "I can't promise you something that I can't guarantee . . . I want you to tell me the truth of what you witnessed and I guarantee you that [the prosecutors are] gonna look at that hard and they're gonna realize that you're being helpful with this investigation." At the end of the interview, Apodaca asked Detective Martell how long he thought he would spend incarcerated and Detective Martell replied, "[I]t's not up to us[,] it is something that the, the courts make a decision on."

*Procedural History*

¶16 Apodaca was charged with one count of aggravated kidnapping, one count of aggravated robbery, one count of obstruction of justice, and four counts of felony discharge of a firearm. The aggravated robbery and the discharge of a firearm charges were based on a theory of accomplice liability.

¶17 Before the case went to trial, Apodaca moved to suppress the incriminating statements he made to police, asserting that police obtained his statements in violation of his *Miranda* rights. Apodaca also argued that his statements were obtained through coercive inducement in violation of his Fifth Amendment and Fourteenth Amendment rights, and that his statements were therefore involuntary and could not be used against him for any purpose.

¶18 The State stipulated to the *Miranda* violation and agreed to not use Apodaca's statements in its case-in-chief, but argued that the statements were voluntary and therefore admissible for

impeachment purposes. After conducting an evidentiary hearing, the trial court found that the confession was voluntary and ruled that Apodaca's statements could be used for impeachment because "there was no coercion or duress associated with the statements." The court explained,

> [O]n the spectrum of this idea of trickery or coercion—the suggestion that somebody . . . engages in voluntary conversations doesn't rise to the level of what might otherwise be duress or coercion, nor is a promise to pass on information associated with Mr. Apodaca's cooperation, which is what this Court understands that testimony to be—an inducement for which somehow would obviate the voluntary nature of freely given information.

¶19 In opening statements at trial, Apodaca's defense counsel argued that Apodaca was compelled to play the role of getaway driver. Defense counsel stated that Apodaca thought he was simply engaging in a drug deal and did not know that Vigil had a gun. Defense counsel also argued that Apodaca obeyed Vigil's orders to drive because he was afraid of Vigil and that Apodaca "didn't assist anyone," "was doing what he was told, [and was] found in the circumstances that he didn't want to be in." Additionally, defense counsel explained to the jury that Apodaca had planned to testify in his own defense.[3]

¶20 At the end of the trial, the court instructed the jury on accomplice liability and relevant mental states. Relevant to this appeal, the instruction for aggravated robbery stated that the jury had to find beyond a reasonable doubt that Apodaca "intended that Gilbert Vigil commit the crime of Aggravated Robbery; or was aware that his conduct was reasonably certain to result in Gilbert Vigil committing the crime of Aggravated Robbery." In other words, the jury instruction allowed the jury to convict Apodaca of aggravated robbery if he acted intentionally or knowingly. The jury acquitted Apodaca on all four counts of felony discharge of a firearm, but convicted him of aggravated kidnapping, aggravated robbery, and obstructing justice. Apodaca appealed.

---

[3] Because of the trial court's ruling on Apodaca's motion to suppress, Apodaca did not testify at trial because doing so would have subjected him to impeachment with his confession and incriminating statements.

¶21 Apodaca argued two issues before the court of appeals: (1) that the trial court erred in holding that his statements to police were voluntary, and (2) that the trial court improperly instructed the jury that it could convict him of aggravated robbery as a party if it found that he acted knowingly. *See State v. Apodaca*, 2018 UT App 131, ¶¶ 31–32, 428 P.3d 99. Apodaca raised the instruction issue under plain error, manifest injustice, and ineffective assistance of counsel. *Id.* ¶ 32.

¶22 The court of appeals held that the trial court correctly ruled that the statements were not coerced and that Apodaca could not show prejudice from the faulty jury instructions. In doing so, the court of appeals considered the totality of the circumstances—including "the details of the interrogation" and "the characteristics of the accused"—in determining that Apodaca's statements were not coerced. *Id.* ¶ 36. Regarding the alleged Christmas release promise made during the unrecorded second segment, the court of appeals found that the trial court's ruling implied that it believed Detective Jensen—who testified that he merely promised to relay any cooperation to the prosecuting attorney—and disbelieved Apodaca. *Id.* ¶ 43. Accordingly, the court of appeals found that the alleged promises did not weigh in favor of coercion. *Id.* ¶ 46. However, the court of appeals did find that the *Miranda* violation weighed in favor of coercion. *Id.* ¶ 50. But because it found that no other factors indicated coercion, the court of appeals held that, under a totality of the circumstances, Apodaca's statements were made voluntarily and were therefore admissible for impeachment purposes. *Id.* ¶ 67.

¶23 The court of appeals also found that the aggravated robbery instruction was incorrect as to the *mens rea* required to convict Apodaca, and that counsel had performed deficiently by not objecting to it. *Id.* ¶¶ 70–76. Specifically, the jury instruction on aggravated robbery allowed the jury to convict Apodaca for knowing conduct when aggravated robbery rightfully requires a finding of intentional conduct. *Id.* However, the court of appeals agreed with the State that Apodaca had not shown that this instruction was prejudicial because he did not show that there was a reasonable likelihood that the jury could conclude he acted knowingly without also concluding that he acted intentionally. *Id.* ¶ 84. Additionally, it found insufficient evidentiary support for Apodaca's assertion that he had acted out of fear. *Id.* ¶ 79. Accordingly, the court of appeals ruled that the faulty jury instruction did not prejudice Apodaca. *Id.* ¶ 85.

¶24 We exercise jurisdiction under Utah Code section 78A-3-102(3)(a).

## STANDARD OF REVIEW

¶25 On certiorari, "we review the decision of the court of appeals and not that of the trial court." *Longley v. Leucadia Fin. Corp.*, 2000 UT 69, ¶ 13, 9 P.3d 762. We review the court of appeals' decision for correctness. *State v. Trujillo*, 2019 UT 5, ¶ 9, 439 P.3d 588. "The correctness of the court of appeals' decision turns, in part, on whether it accurately reviewed the trial court's decision under the appropriate standard of review." *State v. Levin*, 2006 UT 50, ¶ 15, 144 P.3d 1096.

## ANALYSIS

¶26 The court of appeals' robust opinion admirably analyzes both the facts and the law behind Apodaca's case. We see little to correct in its analysis. We do, however, take time to flag a potential issue regarding the appropriate standard of review when analyzing a trial court's determination of voluntariness. And we note the need for trial courts to clarify and explain any implicit findings they make. We also highlight the holistic and open-ended nature of the totality of circumstances analysis required of the court when assessing whether confessions or incriminating statements made to police were coerced, and therefore not given voluntarily. Lastly, we affirm the court of appeals' holding that the jury instructions regarding aggravated robbery were not prejudicial.

### I. APODACA'S STATEMENTS WERE VOLUNTARILY MADE AND THEREFORE ADMISSIBLE FOR IMPEACHMENT

¶27 Neither party disputes that Apodaca's statements were obtained in violation of his *Miranda* rights and were therefore unavailable for the state's case-in-chief. We have echoed the United States Supreme Court in holding that individuals are protected from being compelled to incriminate themselves under the Fifth and Fourteenth Amendments to the United States Constitution. *See State v. Arriaga-Luna*, 2013 UT 56, ¶ 9, 311 P.3d 1028. But we have also agreed with the United States Supreme Court that, while statements "taken in violation of only the prophylactic *Miranda* rules may not be used in the prosecution's case in chief, they are admissible to impeach conflicting testimony by the defendant." *State v. Troyer*, 910 P.2d 1182, 1190 (Utah 1995) (quoting *Michigan v. Harvey*, 494 U.S. 344, 350–51 (1990)). The rationale for this rule is that "if defendants exercise their right to testify on their own behalf, they assume a reciprocal 'obligation to speak truthfully and accurately.'" *Id.* (quoting *Harvey*, 494 U.S. at 351). The law does not

allow "a defendant to 'turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.'" *Id.* (quoting *Harvey*, 494 U.S. at 351). In this case, the trial court ruled that Apodaca's statements were available to be used as impeachment evidence as the prior inconsistent statements of a declarant if he chose to testify.[4] Legally, such statements, in this case those made by Apodaca in violation of his *Miranda* rights, are admissible as impeachment evidence if they are made voluntarily.

¶28 "The ultimate goal of analyzing whether a confession was coerced" and therefore involuntary "is to determine 'whether, considering the totality of the circumstances, the free will of the witness was overborne.'" *Arriaga-Luna*, 2013 UT 56, ¶ 9 (quoting *United States v. Washington*, 431 U.S. 181, 188 (1977)). It may be true that no one single issue or specific circumstance is egregious enough by itself to qualify as coercive. However, coercion may still result from *the cumulative effect of many relatively minor issues*. This is a review of the totality as a totality, not a checklist of discrete and isolated factors. "[T]he totality of circumstances [includes] both the characteristics of the accused and the details of the interrogation." *State v. Rettenberger*, 1999 UT 80, ¶ 14, 984 P.2d 1009 (alterations in original) (citation omitted) (internal quotation marks omitted). And we have noted that "as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the ''voluntariness' calculus." *Id.* ¶ 15 (citation omitted) (internal quotation marks omitted). "Additionally, for a confession to be involuntary there must be a causal connection between the coercion and the confession." *Arriaga-Luna*, 2013 UT 56, ¶ 10. The State bears the burden of demonstrating "by a preponderance of the evidence

---

[4] Not all impeachment evidence is admissible. Due to the *Miranda* violation, Apodaca's statements to the detectives were not admissible in the State's case-in-chief. However, if Apodaca were to testify, they could have been introduced as prior inconsistent statements. *See* UTAH R. EVID. 801(d)(1)(A) ("A statement that meets the following conditions is not hearsay: The declarant testifies and is subject to cross-examination about a prior statement, and the statement: is inconsistent with the declarant's testimony . . . .")

that the statement was made voluntarily." *Rettenberger*, 1999 UT 80, ¶ 45 (citation omitted) (internal quotation marks omitted).[5]

¶29 The court of appeals did an excellent job in reviewing the trial court's determination of voluntariness. And we agree with the court of appeals that Apodaca's statements to police were not the product of coercion. The court of appeals conducted a thorough analysis addressing Apodaca's arguments "regarding the detectives' use of threats and promises[,] . . . the conceded *Miranda* violation, the false friend technique, misrepresentations, isolation, denial of medication, and the alleged use of Apodaca's subjective characteristics to coerce his confession." *State v. Apodaca*, 2018 UT App 131, ¶ 39, 428 P.3d 99. Because we agree with the court of appeals' opinion, we quote from its analysis extensively.[6]

_____

[5] We pause to note that, since Apodaca's original trial, we have updated the Utah Rules of Evidence by the passage of rule 616(b), which states that "evidence of a statement made by the defendant during a custodial interrogation in a place of detention shall not be admitted against the defendant in a felony criminal prosecution unless an electronic recording of the statement was made and is available at trial." Accordingly, law enforcement should record all statements made in places of detention.

[6] We have previously said that the "ultimate determination of voluntariness is a legal question; accordingly, we review the district court's ruling for correctness." *Rettenberger*, 1999 UT 80, ¶ 10. Based on this language, both parties, and hence the court of appeals, advanced a correctness analysis. But the voluntariness analysis requires an inquiry into the "totality of the circumstances" of the individual case to understand whether the "free will of the witness was overborne." *Arriaga-Luna*, 2013 UT 56, ¶ 9 (citation omitted) (internal quotation marks omitted). Therefore, the question of voluntariness is a legal standard applied to and guided by specific facts. We question if this is in fact more akin to a mixed question of law and fact than a naked legal issue. *See Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 24, 308 P.3d 461 ("Mixed questions 'involv[e] application of a legal standard to a set of facts unique to a particular case.'") (alteration in original) (citation omitted) (internal quotation marks omitted). And, indeed, many other jurisdictions have recognized the mixed nature of the review of voluntariness. *See, e.g., People v. Humphrey*, 132 P.3d 352, 364 (Colo. 2006) (Coats, J., concurring in part and dissenting in part) ("[A]n ultimate finding of voluntariness has come to be understood as a mixed question of

(continued . . .)

*Threats and Promises*

¶30 Apodaca first argues that his will was overcome as a result of threats and promises made by the detectives. Specifically, Apodaca asserts that Detective Jensen promised him that he would be out by Christmas if he cooperated. According to Apodaca, he understood this as a guaranteed promise of leniency and would not have waived his rights without such a promise. However, the State argues that Detective Jensen only promised to "relay any of Apodaca's cooperation to the prosecuting attorney." The trial court found that the detective only promised to relay Apodaca's cooperation to the prosecution—and therefore the promise was not coercive—and the court of appeals ruled that the trial court's finding was not clear error. *Id.* ¶ 42.

¶31 We have said that "[t]he mere representation to a defendant by officers that they will make known to the prosecutor and to the court that [the defendant] cooperated with them" is not a coercive promise. *State v. Strain*, 779 P.2d 221, 225 (Utah 1989). The

---

fact and law . . . ."); *Linares v. State*, 471 S.E.2d 208, 211 (Ga. 1996) ("The issue [of voluntariness] presents a mixed question of fact and law."); *Rosky v. State*, 111 P.3d 690, 694 (Nev. 2005) (noting that "voluntariness determinations present mixed questions of law and fact"). In mixed questions the "applicable standard [of review] depends on the nature of the issue and the marginal costs and benefits of a less deferential, more heavy-handed appellate touch." *In re Adoption of Baby B.*, 2012 UT 35, ¶ 42, 308 P.3d 382. We have articulated how this cost-benefit analysis should be conducted through the three-factor *Levin* evaluation. *See, e.g.*, *Sawyer v. Dep't of Workforce Servs.*, 2015 UT 33, ¶ 12, 345 P.3d 1253 (citing *State v. Levin*, 2006 UT 50, ¶ 25, 144 P.3d 1096).

We acknowledge that here this may be a distinction without a difference. Even if we were to say that voluntariness is a mixed question of law and fact, an analysis under the *Levin* factors may well show voluntariness questions to be heavily "law-like," in which case we would still review the district court's decision with minimal deference. Because neither the court of appeals nor this court were asked to do so, we do not undertake such an analysis here. We do, however, note this hiccup in our precedent and invite briefing in future cases on what the appropriate standard of review should be when reviewing trial court determinations of voluntariness.

district court found that Detective Jensen only promised Apodaca that he would relay Apodaca's cooperation to the prosecuting attorney. As noted above, *see supra* ¶ 22, this finding required implicitly finding that Detective Jensen was more credible than Apodaca. And because the trial court did not explain this implicit finding, it deserves less deference than we would normally afford a trial court's findings of fact. Nevertheless, Apodaca has failed to demonstrate error in the trial court's finding, even under a less deferential standard of review. Although the third interview segment begins with Apodaca expressing that he would like to be released by Christmas, there is nothing else in the recorded interviews to suggest that the detectives made any promise regarding Apodaca's release. Instead, the recorded interviews are replete with instances of the detectives explaining to Apodaca that they cannot make any guarantees and that the prosecuting attorney would make the final decisions, not the detectives. Accordingly, we cannot say that the trial court's finding was in error and therefore this fact, on its own, does not tend to demonstrate that Apodaca's testimony was coerced. *See Strain*, 779 P.2d at 225. We leave for later whether, when all the factors are considered in their totality, Apodaca's statements were coerced.

*The Guarantee of Leniency*

¶32 Apodaca's second argument is closely related to his first. He asserts that his statements were coerced because the detectives guaranteed him leniency in exchange for his cooperation. Specifically, Apodaca points to Detective Jensen's statements that "it always look[s] better to cooperate" and that he would "let the prosecution know" about Apodaca's cooperation. The court of appeals held that such statements were not coercive because the detectives repeatedly stated that they could not make promises or guarantees to Apodaca regarding his incarceration. *Apodaca*, 2018 UT App 131, ¶ 49.

¶33 We agree with the court of appeals that the detectives did not make any guarantee of leniency to Apodaca in return for his cooperation. The detective's statements to Apodaca that the prosecutors would "look at [his cooperation] hard and . . . realize that [he was] being helpful with this investigation" were not a guarantee of leniency when viewed in the full context of the interview—as the court of appeals carefully clarified.[7] *Id.* ¶ 48. This

_____

[7] "[T]he statement's context demonstrates that it was not made to coerce a confession from Apodaca about his involvement in the

(continued . . .)

is especially clear from the detective's response to Apodaca when Apodaca asked if he could go home faster if he cooperated, to which the detective replied, "I can't promise you something that I can't guarantee." As the court of appeals noted, "[o]n its face and in context, the detective's statement does not guarantee Apodaca a certain result. Instead, the context shows that the detective was suggesting to Apodaca that cooperating would be his best option; such a suggestion is not coercive." *Id.* We agree. Accordingly, this alone does not tend to demonstrate coercion. But we leave for later the effect these statements have on a totality analysis.

*The Miranda Violation*

¶34 Apodaca's third argument is that his statements were coerced because they were taken in violation of his *Miranda* rights. The State conceded that a *Miranda* violation occurred during the initial interview with Apodaca and accordingly did not use Apodaca's statements in its case-in-chief. The only remaining question is whether this violation was so coercive as to render his statements involuntary, and therefore inadmissible for impeachment purposes. We agree with the trial court and the court of appeals that the *Miranda* violation favors a finding of coercion, but is alone insufficient for a finding of coercion. *See id.* ¶ 50 ("[A] *Miranda* violation alone is insufficient grounds for suppressing statements offered to impeach the defendant's testimony." (alteration in original) (citation omitted) (internal quotation marks omitted)).

¶35 In this case, Apodaca's statements, while obtained in violation of *Miranda*, are still admissible for impeachment purposes unless our totality of the circumstances review proves them to be coerced. *See Met v. State*, 2016 UT 51, ¶ 54, 388 P.3d 447. The violation is itself part of the totality analysis and certainly weighs in favor of Apodaca's case. But as the court of appeals noted, it alone is insufficient to prove coercion and we leave for later analysis whether Apodaca's statements were coerced.

---

crime; the detective was encouraging Apodaca to identify the shooter rather than assume greater responsibility for the crime." *Apodaca*, 2018 UT App 131, ¶ 48 n.8; *cf. Strain*, 779 P.2d at 226 (explaining that police conduct is impermissibly coercive when it "carrie[s] a threat of greater punishment or a promise for lesser punishment depending on whether [the accused] confesse[s]").

*False Friend Technique*

¶36 Apodaca's fourth argument is that Detective Martell used the false friend technique to coerce statements from Apodaca. Specifically, Apodaca points to Detective Martell's statements that he understood Apodaca's "hard life" and that other officers might not be so understanding, and Detective Jensen's offer to protect Apodaca from retribution if he named the shooter. The court of appeals held that these facts did not weigh in favor of a finding of coercion. *Apodaca*, 2018 UT App 131, ¶ 54. We agree.

¶37 As the court of appeals noted, "[t]he false friend technique is one 'whereby the interrogator represents that he is a friend acting in the suspect's best interest.'" *Id.* ¶ 52 (citation omitted). "Standing alone, the false-friend technique is not sufficiently coercive to produce an involuntary confession, but may be significant in relation to other tactics and factors." *Id.* (citation omitted) (internal quotation marks omitted). Additionally, the false friend technique may be coercive if the defendant suffers from some form of cognitive impairment. *See Rettenberger*, 1999 UT 80, ¶ 26.

¶38 In this case, Apodaca has not shown that any cognitive impairment made him especially susceptible to the false friend technique. While it was clear that both detectives tried to establish rapport with Apodaca, the statements made by both detectives simply demonstrate a desire to work with Apodaca to solve the case. The statement that comes closest to coercing Apodaca through the false friend technique is Detective Jensen's offer to protect Apodaca if he gave the name of the shooter. But as the court of appeals stated, "the detective's offer to personally protect Apodaca was made *after* Apodaca had implicated himself and in response to Apodaca's expression of concern about retaliation if he were to name the shooter." *Apodaca*, 2018 UT App 131, ¶ 54. Therefore, it is highly unlikely that any of Apodaca's incriminating statements were given solely based on Detective Jensen's offer of protection. Because Apodaca has not shown that he was highly susceptible to the false friend technique, and because Apodaca gave incriminating statements before the alleged use of the false friend technique, these facts do not weigh in favor of a finding of coercion. We leave the effect of these facts on our totality analysis for later.

*Misrepresentations*

¶39 Apodaca's fifth argument regarding coercion is that the detectives made several misrepresentations that overbore his will. Specifically, Apodaca points to Detective Martell's statement at the beginning of the first interview that, "my opportunity here is not to

question you, not to interrogate you but to give you the opportunity to tell me your side." In Apodaca's view, these statements were designed to make Apodaca underestimate the importance of the conversation and believe that cooperation was in his best interest. Additionally, Apodaca claims that the detectives misrepresented the strength of the evidence when they told him that they already knew everything and that they just needed to hear it from him. The court of appeals concluded that Apodaca had not demonstrated that any of these representations were sufficient to overcome his will. *Id.* ¶ 56.

¶40 We agree with the court of appeals that the detectives made no misrepresentations to Apodaca sufficient to overbear his will. With respect to Detective Martell's statement regarding the purpose of the conversation, we cannot say that this statement was misleading. While the detective was obviously trying to extract information from Apodaca, Apodaca has presented no evidence to suggest that it was misleading for Detective Martell to tell Apodaca that he had an opportunity to tell his side of the story. And with respect to the statements regarding the strength of the State's evidence, "[w]e have recognized that '[a] defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is.'" *Rettenberger*, 1999 UT 80, ¶ 20 (second alteration in original) (citation omitted). Accordingly, these facts do not tend to weigh in favor of a finding of coercion, but we leave their effect on our totality analysis for later.

*Isolation and Medication*

¶41 Apodaca's next argument centers on his isolation and his methadone prescription. Apodaca argues that his statements were coerced because he was questioned late at night in a police vehicle and in an interrogation room, and because the detectives denied his requests to speak to his girlfriend. Additionally, Apodaca asserts that his statements were coerced because he needed access to his methadone prescription by morning. The court of appeals held that Apodaca did not suffer or experience a level of isolation that would amount to coercion, *Apodaca*, 2018 UT App 131, ¶ 59, and that Apodaca was not denied any request for immediate medical attention, *id.* ¶ 62.

¶42 In the past, we have found that five to six hour interrogations are not in and of themselves coercive. *See State v. Ashdown*, 296 P.2d 726, 729 (Utah 1956); *see also State v. Leiva-Perez*, 2016 UT App 237, ¶¶ 14–15, 391 P.3d 287. Apodaca's isolation while

being interviewed was at most four hours, and Apodaca has not pointed to other facts to suggest that his isolation rose to a coercive level. While the detectives ignored his request to speak with his girlfriend, Apodaca only made one request before he began making incriminating statements. *Apodaca*, 2018 UT App 131, ¶ 60. In other words, the detectives did not repeatedly deny Apodaca access to his friends or family. Accordingly, this factor does not weigh in favor of coercion.

¶43 We also agree with the court of appeals that Apodaca was not denied medication during the course of his interrogation. During the first segment of the interview, Apodaca told the detective "I'm pretty sick to my stomach and I'm gonna need my methadone soon in the morning . . . . [W]hen I don't have that I can't even function." We agree with the court of appeals that this amounts to a request for future medication and does not express any immediate need. We see no evidence that Apodaca told the detectives then, or at any later point, that he had an urgent need for medication, and the detectives never conditioned receipt of medication on his cooperation. "Because the record does not support Apodaca's claim regarding the denial of medication, this factor weighs against a conclusion of coercion." *Id.* ¶ 62.

*Apodaca's Subjective Characteristics*

¶44 Finally, Apodaca argues that the detectives exploited his subjective characteristics, namely his lack of legal training and his desire to avoid jail, in order to coerce his statements. The court of appeals found that Apodaca did not exhibit any subjective characteristics that would make him especially susceptible to coercion. *Id.* ¶ 66. We agree.

¶45 Courts consider a defendant's "subjective characteristics, especially as known to the interrogating officers, to determine the extent to which those characteristics made [them] more susceptible to manipulation." *Rettenberger*, 1999 UT 80, ¶ 37. We share the court of appeals' view that the record in this case does not support Apodaca's argument that he was especially susceptible to manipulation. Apodaca was in constant negotiation with the detectives for a deal, and expressed on multiple occasions his awareness of his rights and of the paperwork that would be filed should he speak out against his accomplices. Even though Apodaca may not have any formal legal training, he appears throughout the record to have a detailed understanding of the criminal system and the rights that the system affords to him. Furthermore, Apodaca's desire to avoid jail is hardly a subjective characteristic that would

make someone especially susceptible to manipulation.[8] Additionally, "Apodaca does not cite any evidence that his mental health, mental deficiency, [or] emotional instability affected the voluntariness of his statements to the detectives, and our review of the record reveals none." *Apodaca*, 2018 UT App 131, ¶ 66 (alteration in original) (citation omitted) (internal quotation marks omitted). Accordingly, this factor does not weigh in favor of coercion.

### Cumulative Effect of the Evidence

¶46 We conclude by reemphasizing that this review is meant to be a total and cumulative inquiry. There may be a hypothetical circumstance in which all factors considered in isolation do not rise to the level of compulsion, but when taken together can weigh in favor of coercion. However, in this case we agree with the court of appeals that the totality of the circumstances demonstrates that Apodaca's statements to police were made voluntarily. Only one factor, the *Miranda* violation, weighs in favor of coercion. Otherwise, the record conclusively demonstrates that Apodaca's will was not overcome. From the start, Apodaca demonstrated that he was a shrewd negotiator and had a good understanding of what was going on. While the detectives tried to build rapport with Apodaca by promising to relay his cooperation to the prosecuting attorneys, the detectives never made promises or guarantees that would have overcome Apodaca's free will. Nor did the detectives deny Apodaca access to friends, family, or medication, or threaten Apodaca in any way such that he would have felt coerced to make incriminating statements. Accordingly, Apodaca has not demonstrated that his confession and statements were coerced, and therefore we affirm the court of appeals.

### II. THE AGGRAVATED ROBBERY JURY INSTRUCTION

¶47 Apodaca next challenges his conviction of aggravated robbery due to the fact that the jury was improperly instructed as to the appropriate *mens rea* required for the offense. Although the court of appeals agreed that Apodaca's defense counsel performed deficiently by not objecting to the incorrect instruction, the court held that Apodaca was not prejudiced because Apodaca "fail[s] to articulate a theory of the evidence that supports his contention that

---

[8] If the opposite were true, then it would seem to follow that the majority of the general populace would be especially susceptible to manipulation. Indeed, it is difficult to imagine that the vast majority of people do not desire to avoid jail.

it is reasonably likely that the jury found that his participation in the aggravated robbery was knowing but not intentional." *State v. Apodaca*, 2018 UT App 131, ¶ 79, 428 P.3d 99. We agree.[9]

¶48 In order to be convicted of a crime, the State must prove that the defendant acted "with the mental state required for the commission of an offense." UTAH CODE § 76-2-202. "[A]ccomplice liability adheres only when the accused acts with the mens rea to commit the principal offense." *State v. Calliham*, 2002 UT 86, ¶ 64, 55 P.3d 573. The parties agree that the elements of the principal offense, aggravated robbery, required intentional conduct. Therefore, Apodaca could be convicted of aggravated robbery under an accomplice theory of liability only if the jury found that he acted intentionally.

¶49 But the jury was instructed to find Apodaca guilty beyond a reasonable doubt if he "intended that Gilbert Vigil commit the crime of Aggravated Robbery; or was aware that his conduct was reasonably certain to result in Gilbert Vigil committing the crime of Aggravated Robbery." This is an incorrect statement of law. While the instruction correctly allowed the jury to find Apodaca guilty of aggravated robbery if it found he acted intentionally, the instruction also permitted the jury to find Apodaca guilty of aggravated robbery if he acted merely knowingly rather than intentionally. This error thus allowed for a conviction at a lower threshold of mental culpability. However, this error is not enough to overturn a conviction without a showing of prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶50 To show prejudice, Apodaca must demonstrate that "but for the error, there is a reasonable probability that the verdict would have been more favorable to [him]." *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993), *abrogated on other grounds by State v. Silva*, 2019 UT 36, ---P.3d---. As the court of appeals noted, this requirement "is a relatively high hurdle to overcome." *Apodaca*, 2018 UT App 131, ¶ 77 (quoting *State v. Garcia*, 2017 UT 53, ¶ 44, 424 P.3d 171). Most notably this means that a mere potential effect on the outcome is not enough. *See Strickland*, 466 U.S. at 693. Instead, "[t]he likelihood of a different result must be substantial."

---

[9] Because we ultimately conclude that Apodaca was not prejudiced by the erroneous instruction, we need not consider whether counsel's failure to object to the instruction constituted deficient performance.

*Harrington v. Richter*, 562 U.S. 86, 112 (2011). Apodaca has failed to carry this burden.

¶51 In assessing whether Apodaca was prejudiced, we "must consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *See Garcia*, 2017 UT 53, ¶ 42 (citation omitted) (internal quotation marks omitted). Put another way, we ask whether the "failure to instruct the jury properly undermines confidence in the verdict." *Id.* In this case, that inquiry focuses on whether there is a reasonable probability that the jury found Apodaca acted knowingly, rather than intentionally, with respect to the aggravated robbery charge. We agree with the court of appeals that Apodaca has not demonstrated such a probability.

¶52 Apodaca has not shown prejudice because the evidence presented at trial amply demonstrated that he actively and intentionally planned, participated in, and attempted to cover up the aggravated robbery. J.H. testified that Apodaca drove away while he was counting out the pills, encouraged the handing over of said pills, and told his friend to shoot J.H. when J.H. did not comply. Apodaca's co-defendant testified that Apodaca had a detailed agreement with him to rob the victim, drive the car, and bring along a "homie" with a gun. As the State points out, this set of facts matches many of our precedents affirming convictions for aggravated robbery as an accomplice. *See*, *e.g.*, *State v. Jimenez*, 2012 UT 41, ¶ 14, 284 P.3d 640 (affirming a conviction for aggravated robbery as an accomplice where defendant acted as getaway driver and knew that co-defendant had a gun during the robbery); *State v. Smith*, 706 P.2d 1052, 1056 (Utah 1985) (affirming a conviction for aggravated robbery as an accomplice where defendant helped plan and recruit other co-defendants and drove the getaway vehicle).

¶53 We have said that "there exists a narrow set of circumstances where a person may act 'knowingly' without acting 'intentionally.'" *State v. Casey*, 2003 UT 55, ¶ 47, 82 P.3d 1106. However, "most 'knowing' conduct also fits accurately within the statutory definition of 'intentional' conduct." *Id.* Therefore, despite the ineffectiveness of Apodaca's counsel it is still his "burden to show that he was prejudiced by his counsel's performance" by demonstrating how the jury could have reasonably concluded that he acted knowingly without also concluding that he acted intentionally. *Garcia*, 2017 UT 53, ¶ 37. This he has failed to do. Besides the mere suggestion that "it is reasonably likely that the jury would have acquitted him of aggravated robbery if it believed

he did not originally plan to rob [J.H.], Apodaca has not articulated how the jury reasonably could have concluded that he acted knowingly without also concluding that he acted intentionally." *Apodaca*, 2018 UT App 131, ¶ 84. Accordingly, Apodaca has not demonstrated that there is a reasonable probability that the verdict would have been more favorable to him if the jury instruction had not been incorrect, and therefore he did not suffer prejudice as a result of the erroneous instruction.

## CONCLUSION

¶54 The court of appeals correctly reviewed the trial court's findings and affirmed that Apodaca's statements to police were voluntary. His confession and incriminating statements could be used for impeachment purposes in the event that Apodaca chose to testify. Furthermore, there is no evidence presented or reason to suspect that the faulty jury instruction given at trial affected the outcome or the verdict. We affirm the court of appeals.