2025 UT App 1

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MARTIN ROBERT HERRERA,
Appellant.

Opinion
No. 20220068-CA
Filed January 3, 2025

Third District Court, Tooele Department
The Honorable Dianna Gibson
No. 181300794

Emily Adams, Freyja Johnson, and Rachel Phillips
Ainscough, Attorneys for Appellant

Sean D. Reyes and William M. Hains,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

OLIVER, Judge:

¶1　The day after Martin Robert Herrera's girlfriend, Nicole, arrived at the emergency room with her friend, Tom, and stated that she had "been getting beat by [her] husband," a police officer (Officer) took Herrera into custody and interrogated him.[1] Officer later arrested Herrera, and he was charged with one count of aggravated burglary, one count of assault against Tom, and one count each of aggravated assault and assault against Nicole. A jury acquitted Herrera of aggravated burglary but convicted him on the aggravated assault charge and both assault charges. Herrera appeals these convictions, arguing that trial counsel

---

1. Nicole and Tom are pseudonyms.

(Counsel) was ineffective for failing to object to (1) Officer's testimony regarding the custodial interrogation of Herrera during the State's case in chief when there was no electronic recording of the interrogation, (2) witnesses testifying about the credibility of other witnesses, and (3) the triage nurse's (Nurse) testimony that she wanted to "speak out" for Nicole. We reject Herrera's arguments and affirm his convictions.

## BACKGROUND[2]

### *The Incident and Allegations*

¶2 On a Wednesday in December 2018, Nicole stopped by Tom's house. Tom noticed that "she had a contusion on her left temple" when she arrived. Around five minutes later, Herrera arrived at the house, entered "without permission," and began staring at Nicole. After a few minutes, Tom pushed Herrera "out the door and . . . tried to close the door." However, Herrera reentered the house and punched Tom once in the head and several times in the ribs. Herrera then exited the house and left the area.

¶3 After Herrera left, Tom and Nicole went to the emergency room. Nicole's chief complaint upon arrival was that she had "been getting beat by [her] husband."[3] Nicole reiterated to Nurse

---

2. On appeal from a jury trial, "we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly," and "we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Speights*, 2021 UT 56, n.1, 497 P.3d 340 (cleaned up).

3. Nicole sometimes referred to Herrera as her husband, even though they weren't married, and Herrera admitted that people often viewed them as "husband and wife."

that "she had been beaten by her husband" that day and the day before. Nicole also showed Nurse bruises on her right abdomen and leg, a cut on her left ear, and a mark on her neck.[4] Nicole stated the mark on her neck was "where he choked" her.

¶4    Nicole became less forthcoming with information about her injuries when evaluated by the primary nurse and doctor. The primary nurse did an initial abuse assessment and made no findings of abuse, and Nicole refused to "talk about any relationship abnormalities . . . and denie[d] any assault from her boyfriend, or husband," despite reporting such to Nurse at intake. Law enforcement was contacted due to the potential abuse, but when Officer tried to speak with Nicole at the hospital, she refused to have any photos taken of her or to tell Officer anything except that "she had fallen."

¶5    When she arrived at the hospital, Nicole's blood alcohol concentration was .522, over ten times the legal limit, and she was diagnosed with "alcohol abuse with intoxication delirium." However, Nurse testified that Nicole scored perfectly on the Glasgow Coma Scale[5] and that Nurse only marked "alcohol abuse

---

4. Nicole's medical report noted "bruises in various stages of healing on different part[s] of her body" and swelling and "evidence of trauma to the left ear with a minor 2-3mm laceration that is quite superficial."

5. "The Glascow Coma Scale is a tool healthcare providers use to measure degrees in consciousness." *Glasgow Coma Scale (GCS)*, Cleveland Clinic, https://my.clevelandclinic.org/health/diagnosti cs/24848-glasgow-coma-scale-gcs [https://perma.cc/KW75-FCRE]. The test evaluates eye, motor, and verbal responses. *Id.* To receive a perfect score, patients must be able to "open [their] eyes and keep them open on their own," "follow instructions on how and when to move," and "correctly answer questions about who [they] are," where they are, and the day or year. *Id.*

with intoxication delirium" in the chart because the system had limited options to alert physicians to patients' alcohol abuse. Nurse testified that Nicole was one of the most memorable patients in her thirty-year career "[b]ecause of how upset she was" when she showed Nurse the bruises and how Nicole's demeanor and willingness to talk changed when other hospital staff began treating her. Nurse testified that this "bothered" her so she decided to give a statement to Officer "to speak out" for Nicole.

*The Interview and Arrest*

¶6     The next day, Officer went to Herrera's house, took him into custody, and transported him to the police station for an interview. Herrera told Officer that he and Nicole were living together but when they argued, Nicole would sometimes go to Tom's house. Herrera also initially told Officer that he did not go to Tom's house on Wednesday but, after further questioning, stated he did go to Tom's house on Wednesday. When questioned by Officer about the assaults, Herrera again changed his story and said he did not go to Tom's house and that no assault had occurred. Herrera also made inconsistent statements about whether he had last seen Nicole on Monday or Wednesday.

¶7     After the interview, Officer "made an ultimate decision to place [Herrera] under arrest" due to the "inconsistencies of the interview, the statements, [and the] injuries." Herrera was later charged with aggravated burglary, one count of assault against Tom, and one count each of aggravated assault and assault against Nicole.

*The Trial*

¶8     The case proceeded to a two-day jury trial. The State called Tom, Nurse, and Officer to testify as to the events described above. The recording of Officer's interrogation of Herrera was not

played for the jury because it had been inadvertently erased.[6] After Officer testified, the State rested. Nicole was unable to testify because she had passed away from unrelated medical complications.

¶9 The defense opened its case by calling Herrera, who testified to a vastly different account of the events. Herrera testified that he went to Tom's house on Wednesday to look for Nicole because she left his house on Monday and had not returned. Herrera stated that Nicole would only visit Tom if Tom left the door to his house open because Tom had once tried to sexually assault her. When Herrera arrived at Tom's house and saw the door was open, he assumed Nicole was there. He stated that when he walked up to the door, Tom greeted him by saying, "How you doing, [Herrera]?" and, "Come on in."

¶10 Herrera said he entered the house and saw Nicole sitting on the couch with Tom. Herrera then asked Nicole if she was okay and why she "didn't come home." Herrera stated Nicole told him that Tom was "getting ready to give her a ride to the hospital because of her drinking." Herrera then stated he turned to Tom and asked, "[W]hat's this I hear, that you tried sexually assaulting [Nicole]?" Herrera stated that Tom then stood up and "came at [him] and pushed [him] and told [him] to get out of his house." Herrera said that in response, he pushed Tom and punched him in the chest. Herrera exited the house after Tom said "he was going to go get his gun." Herrera testified that he did not hit Nicole while at the house or at any time during their relationship.

¶11 On cross-examination, Herrera stated that he did not remember telling Officer that he never went to Tom's house and

---

6. While Officer recorded the interview and used the recording to complete his report, he failed to save the recording from the server where it was temporarily stored, so it was erased.

clarified when he had last seen Nicole. The State twice asked Herrera if Officer was "lying" in his testimony about Herrera's statements. The State also asked Herrera four times if Nicole lied in her statements at the hospital and why she would do so. Counsel lodged no objections to these questions.

¶12    The State then called Officer as a rebuttal witness. Officer summarized his interrogation of Herrera, including that during the interrogation Herrera first admitted to going to Tom's house on Wednesday and then denied it and that Herrera told him the last time he had seen Nicole was on Monday.

¶13    In closing, the State encouraged the jury to convict Herrera on all four counts because of the bruise on Nicole's neck and mark on her ear, together with Nurse's and Tom's testimony. Counsel argued for an acquittal, highlighting potential reasons for Nicole to be less than truthful in her statements at the hospital, including the influence of Tom, her seeking medication, and her high level of intoxication.

¶14    The jury acquitted Herrera of aggravated burglary but convicted him of assault against Tom and both aggravated assault and assault against Nicole. The Court sentenced Herrera to an indeterminate term not to exceed five years in prison for the aggravated assault and terms of 364 and 180 days in jail for the assault convictions, which were to run concurrently with the prison sentence.

ISSUES AND STANDARD OF REVIEW

¶15    Herrera now appeals, raising three claims of ineffective assistance of counsel based on Counsel's failure to object to particular testimony. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of

law." *State v. Popp*, 2019 UT App 173, ¶ 19, 453 P.3d 657 (cleaned up).

ANALYSIS

¶16    The Sixth Amendment to the United States Constitution affords criminal defendants "the right to effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To demonstrate ineffective assistance of counsel, Herrera must show "(1) that his counsel's performance was objectively deficient, and (2) that the deficient performance prejudiced the defense." *State v. Marquina*, 2018 UT App 219, ¶ 36, 437 P.3d 628 (cleaned up), *aff'd*, 478 P.3d 37 (Utah 2020); *see also Strickland*, 466 U.S. at 687 (articulating the two-pronged test for evaluating claims of ineffective assistance of counsel). Both elements must be present to demonstrate ineffective assistance. *See State v. Powell*, 2020 UT App 63, ¶ 19, 463 P.3d 705. "If either is lacking, the claim fails, and the court need not address the other." *Id.* (cleaned up).

¶17    "To establish deficient performance, a defendant must show that trial counsel's representation fell below an objective standard of reasonableness when measured against prevailing professional norms." *State v. Weaver*, 2023 UT App 154, ¶ 20, 541 P.3d 958 (cleaned up). "Our scrutiny of counsel's performance must be highly deferential," and we must consider "whether counsel's assistance was reasonable considering all the circumstances," *id.* (cleaned up), beginning with the assumption that "the challenged action might be considered sound trial strategy," *State v. Ames*, 2024 UT App 30, ¶ 18, 546 P.3d 356 (cleaned up), *cert. denied*, 550 P.3d 993 (Utah 2024).

¶18    And to establish prejudice, Herrera must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Demonstrating

prejudice "is a relatively high hurdle" for a defendant to overcome because it requires a defendant to show not only that there is a "potential effect on the outcome" but that "the likelihood of a different result" is substantial. *State v. Apodaca*, 2019 UT 54, ¶ 50, 448 P.3d 1255 (cleaned up).

## I. Officer's Testimony About Herrera's Custodial Interrogation

¶19 Herrera first asserts that Counsel provided ineffective assistance by failing to object to Officer's testimony about Herrera's custodial interrogation during the State's case in chief because no electronic recording of the interrogation was available. Rule 616 of the Utah Rules of Evidence requires that "evidence of a statement made by the defendant during a custodial interrogation in a place of detention shall not be admitted against the defendant in a felony criminal prosecution unless an electronic recording of the statement was made and is available at trial." Utah R. Evid. 616(b). Assuming, then, that Counsel performed deficiently by not objecting to Officer's testimony, Herrera must still demonstrate prejudice. He must prove "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In evaluating whether Herrera met this "high hurdle," *State v. Apodaca*, 2019 UT 54, ¶ 50, 448 P.3d 1255 (cleaned up), this court considers "a hypothetical— an alternative universe where the testimony was not presented to the jury." *State v. Hernandez*, 2024 UT App 127, ¶ 26, 557 P.3d 639 (cleaned up), *cert. denied,* Dec. 19, 2024 (No. 20241167).

¶20 If Counsel successfully had objected to Officer's testimony during the State's case in chief, Officer's testimony about the interrogation would nonetheless have been admissible to impeach Herrera. *See* Utah R. Evid. 616(c)(3) (an exception to rule 616's prohibition is when "[t]he statement is offered for impeachment purposes only"). Because Herrera's statements during the interrogation about whether he visited Tom's house, if

any altercation occurred, and when he last saw Nicole were inconsistent, it is very likely that most if not all of Officer's testimony would have come in as impeachment evidence during the State's rebuttal. *See id*. Although Herrera makes much of the timing difference in when the jury would have heard about the inconsistencies in Herrera's testimony, we fail to see how this timing difference alone would have resulted in a different outcome for Herrera. Indeed, in this alternative universe, Officer's testimony about the interrogation and Herrera's inconsistencies would have come immediately following Herrera's testimony and been the last testimony heard by the jury, thus having significant impact.

¶21　It is also possible that in a different alternative universe Herrera would have decided not to testify in his defense and the jury would not have heard Officer's testimony about the interrogation. But Herrera was the only witness called by the defense, and if he did not testify, the jury would not have heard Herrera's alternative explanation of the events. While Herrera argues that the evidence against him is not overwhelming, without his testimony the jury would have heard only the following unrebutted evidence: Tom's testimony that Nicole arrived at his house with a bruise and that Herrera arrived five minutes later and punched Tom multiple times; Nurse's testimony about Nicole's injuries and Nicole's statement that her "husband" caused them; and Officer's testimony about his conversation with Nurse and Nicole at the hospital and his observation of Nicole's injuries.

¶22　In either of these alternative universes, we are not persuaded that a jury likely would have acquitted Herrera. Because Herrera failed to demonstrate that Counsel's failure to object to Officer's testimony about Herrera's custodial interrogation during the State's case in chief was prejudicial, Herrera's first claim of ineffective assistance of counsel fails.

II. Witnesses Testifying About the Credibility of Other Witnesses

¶23    Herrera next asserts that Counsel was ineffective because the State asked both Officer and Herrera to "opine on the truthfulness of other witnesses" and Counsel failed to object under rule 608 of the Utah Rules of Evidence. That rule prohibits witnesses from offering "a direct opinion of another witness's truthfulness on a particular occasion." *State v. King*, 2010 UT App 396, ¶ 44, 248 P.3d 984 (cleaned up). We address each witness's testimony in turn.

A.    Officer's Testimony

¶24    Herrera argues that Counsel provided ineffective assistance by failing to object to Officer's testimony in which he stated, "I made a decision kind of with his inconsistencies of the interview, the statements, injuries and stuff—I mean, I made an ultimate decision to place him under arrest." Herrera argues that no reasonable defense counsel would have allowed a law enforcement officer to give this testimony, which Herrera characterizes as an opinion as to Herrera's credibility. In support of his argument, Herrera asserts that Officer's statement is similar to the statement of the officer in *Provo City v. Bishop-Garcia*, 2022 UT App 16, 505 P.3d 81, where this court concluded that counsel performed deficiently by not objecting "under rule 608(a)." *Id.* ¶ 22. We disagree, however, because Officer's statements here are not of the same character as those in *Bishop-Garcia*.

¶25    In *Bishop-Garcia*, the prosecutor asked the officer directly "whether he found [the victim] to be credible when he interviewed her," to which he responded, "Yes," and the prosecutor later asked the officer "why he arrested" the defendant, to which the officer responded that he arrested the defendant after determining that the victim's "statement was more credible than the" defendant's statement. *Id.* ¶¶ 21–22 (cleaned up). This court concluded that trial counsel's

performance was deficient because "counsel had ample opportunity to object and prevent the error" where "the prosecution overtly elicited each instance of inadmissible testimony." *Id.* ¶ 25. That is not the case here. Unlike in *Bishop-Garcia*, the State did not overtly elicit Officer's testimony as to Herrera's credibility. Instead, the State asked Officer, "[A]fter your interview [of Herrera], was there anything else of note that occurred—that you did?" It would have been impossible for Counsel to predict that Officer was going to respond to the State's general question with a statement discussing the credibility of Herrera. And as this court noted in *Bishop-Garcia*, counsel in that case performed deficiently precisely because it "was not a situation" where "the officer spontaneously volunteered an inadmissible opinion." *Id*. ¶ 25.

¶26 Here, after Officer spontaneously volunteered an inadmissible opinion, Counsel had to decide whether to object and ask for a curative instruction after the jury already heard Officer's testimony and risk drawing more attention to it. This court has long held that deciding whether to object to testimony and request a curative instruction after the jury has heard it is "a strategic decision," where counsel must weigh the risk of not objecting with the risk of objecting and "drawing attention to unfavorable testimony." *State v. Tippets*, 2021 UT App 137, ¶ 29, 501 P.3d 570 (cleaned up). Counsel's decision not to object and request a curative instruction may be considered "sound trial strategy" because any benefit Herrera "may have gained by requesting a curative instruction may have been offset by" the additional attention drawn to Officer's statement that he put Herrera under arrest because of the inconsistencies in his interview. *State v. Popp*, 2019 UT App 173, ¶ 50, 453 P.3d 657 (cleaned up).

¶27 Accordingly, Herrera has not shown that Counsel acted deficiently by not objecting to Officer's testimony and requesting a curative instruction.

B.    Herrera's Testimony

¶28    Herrera also argues that Counsel provided ineffective assistance by failing to object when the State asked Herrera twice if Officer lied and asked Herrera four times whether Nicole lied. As the State conceded during oral argument, our caselaw prohibits the State from asking criminal defendants about the credibility of other witnesses, and if Counsel had objected, that objection would have been sustained. *See State v. Emmett*, 839 P.2d 781, 787 (Utah 1992) ("Several courts have noted that it is improper to ask a criminal defendant to comment on the veracity of another witness."); *State v. Fairbourn*, 2017 UT App 158, ¶¶ 32–33, 405 P.3d 789 (noting that the prosecution cannot ask a testifying criminal defendant "to decide whether the other witnesses had lied").

¶29    However, even if Counsel's performance in failing to object under rule 608 was deficient, Herrera must still demonstrate that he was prejudiced as a result. Questions where the prosecution asks a criminal defendant whether another witness is lying can be prejudicial when the question "suggests to the jury that a witness is committing perjury even though there are other explanations for the inconsistency." *Emmett*, 839 P.2d at 787. These questions can also be prejudicial when they force the defendant to comment "on the character and motivations of another witness who may appear sympathetic to the jury." *Id.*

¶30    The State asked Herrera, "So you think that [Officer] is lying about this?" and "[S]o that means one of you is lying. So do you think that?" In response, Herrera never stated that Officer was lying, and the questions allowed Herrera to explain the discrepancy between the statements he gave to Officer. Herrera's refusal to state that Officer was lying and his subsequent testimony do not "suggest[] to the jury that" Herrera was committing perjury, *id.*; rather, they provide the jury with a plausible explanation for Herrera's inconsistent statements

during his interrogation that the last time he saw Nicole before the events at the house was on Monday, but he also saw her when he was at the house on Wednesday. Because Herrera refused to testify that Officer was lying and provided testimony clarifying the discrepancies of when he last saw Nicole in response to the State's questions, we conclude that Herrera was not prejudiced by Counsel failing to object.

¶31    In contrast, when the State repeatedly asked Herrera if Nicole lied, he stated that she did. However, Herrera has not established prejudice from this testimony either. Even though Herrera stated that Nicole lied, he needed to explain away her identification of him as the person who caused her injuries, and stating that she lied when she made contradictory statements about the cause of her injuries is less of an attack on Nicole's character and more of an explanation of why the jury should not believe Nicole's initial statements about the cause of her injuries. *See id.* Further, even if the State did not ask Herrera whether Nicole lied, for the jury to believe Herrera's version of events, he would need to explain why Nicole first told hospital staff that her husband caused her injuries, and claiming that Nicole was lying is a sound way to do it. Indeed, during closing arguments, Counsel attempted to explain away Nicole's initial statements by telling the jury that they "can't know for sure" whether Nicole was "telling the truth." We fail to see how Herrera was prejudiced by Counsel failing to object to such questions when Counsel would go on to make the same argument in closing just a short time later. Accordingly, Herrera has not established that he was prejudiced by these questions.

¶32    Because Herrera cannot demonstrate prejudice from the State's questions to him about the truthfulness of either Officer or Nicole, he has failed to prove that he received ineffective assistance of counsel.

III. Nurse's Testimony

¶33    Finally, Herrera takes issue with Nurse's testimony that she wanted to "speak out" for Nicole and that Nicole's case was one of the cases that bothered her the most in her thirty years as a nurse. Herrera argues that Nurse's testimony violated rule 403 of the Utah Rules of Evidence and that Counsel's failure to object to it was ineffective assistance of counsel.

¶34    Rule 403 allows for the exclusion of otherwise relevant evidence if the evidence's "probative value is substantially outweighed by a danger of . . . unfair prejudice." Utah R. Evid. 403. Because "unfair prejudice results only where the evidence has an undue tendency to suggest decision upon an improper basis," we recognize "a presumption in favor of admissibility." *State v. Green*, 2023 UT 10, ¶ 78, 532 P.3d 930 (cleaned up). An improper basis can include emotional decision-making, such as "bias, sympathy, hatred, contempt, retribution or horror." *Woods v. Zeluff*, 2007 UT App 84, ¶ 7, 158 P.3d 552 (cleaned up).

¶35    Herrera argues that the probative value of Nurse's testimony was low because Nurse did not see how Nicole was injured, so her statements that Nicole's case "bothered" her and that she wanted to "speak out" for Nicole were not helpful to the jury in determining how Nicole got her injuries. Herrera further argues that this testimony created a risk of unfair prejudice because it encouraged the jury to "resolve its credibility concerns in favor of Nicole" due to how bothered Nurse was by the case.

¶36    But Herrera inappropriately discounts the probative value of Nurse's statements. After Counsel suggested on cross-examination that Nurse's memory was suspect due to her inability to remember anything about Tom, Nurse's testimony on redirect about why Nicole was memorable to her shows why, nearly three years later, she still remembered Nicole but not Tom. Given this context, it is unlikely that Counsel could have

successfully objected to the testimony under rule 403 because the danger of unfair prejudice—that the jury would have relied on Nurse's statement explaining her memory to decide the case on "an improper basis"—did not substantially outweigh the probative value of her testimony to explain her memory after it was challenged by Herrera. *See Green*, 2023 UT 10, ¶ 78. Because the "failure to raise futile objections does not constitute ineffective assistance of counsel," we conclude that Counsel's failure to object to Nurse's statements under rule 403 does not render Counsel's performance ineffective. *State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546.

## CONCLUSION

¶37 Herrera has not demonstrated that Counsel provided constitutionally ineffective assistance by failing to object to various testimony at trial. We thus affirm Herrera's convictions.

––––––––––