**2019 UT App 186**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DALE HARLAND HEATH,
Appellant.

Opinion
No. 20180076-CA
Filed November 21, 2019

Fourth District Court, Provo Department
The Honorable Derek P. Pullan
No. 151402675

Ann M. Taliaferro, Attorney for Appellant

Sean D. Reyes and Jeffrey S. Gray, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and DAVID N.
MORTENSEN concurred.

POHLMAN, Judge:

¶1     A woman (Victim) suffered from back pain. She visited
Dale Harland Heath's chiropractic offices, where Heath treated
her over the course of nine visits. Based on his conduct during
some of those visits, Heath was convicted of sexual battery
(three counts), forcible sexual abuse, and object rape. Heath
appeals and we affirm.

## BACKGROUND[1]

¶2      When Victim could not find relief from chronic back pain, her mother recommended that Victim seek treatment from Heath, mother's chiropractor. From October 2012 to December 2012, Victim, then age 20, saw Heath nine times. The first four visits were mostly uneventful, though by the fourth visit she was starting to feel "a little uncomfortable." Heath's conduct at the next four visits forms the basis of Heath's criminal case.

### *Count 1—Sexual Battery*

¶3      On November 3, 2012, Victim visited Heath for the fifth time. To prepare for treatment, she changed into a medical gown but kept her yoga pants on. Heath added "a new massage" on this visit, rubbing Victim's inner thigh with one hand and rubbing "right over [her] vaginal area with the other hand." His hand was "going up and down, back and forth, right over the seam of [Victim's] yoga pants, right on [her] vagina." Victim "opened [her] eyes for a moment," noticed that the lights were off, and asked Heath what he was doing. Heath said he was massaging a psoas attachment.[2] Victim, not knowing what

---

1. "On appeal from a jury verdict, we view the evidence and all reasonable inferences in a light most favorable to that verdict and recite the facts accordingly." *State v. Pinder*, 2005 UT 15, ¶ 2, 114 P.3d 551 (cleaned up). In our recitation of the facts, we rely primarily on Victim's trial testimony.

2. The psoas muscles are in the lower back, originating at the spine and running down to the femur. William C. Shiel Jr., *Medical Definition of Muscle, Psoas*, MedicineNet.com, https://www.medicinenet.com/script/main/art.asp?articlekey=96 54 [https://perma.cc/F8V6-35C9].

treatment was necessary to relieve her symptoms, "closed [her] eyes and just waited for it to be over."

¶4 The rubbing lasted a few minutes, and Victim had an orgasm. She gave no outward indication of it, and Heath acted like "nothing was wrong" and did not say anything. After paying for the visit, Victim "cr[ied] the whole way home" while trying to "explain it away" in her mind.

### Count 2—Sexual Battery

¶5 On November 24, 2012, Victim returned for her sixth session with Heath. She decided to return because she "was in a lot of pain" and "didn't really want to believe that it had happened." She trusted Heath, and his treatment had been helping to reduce her back pain.

¶6 Heath again massaged Victim's "clitoral or vaginal area" over her clothes. Victim asked what he was doing, and Heath responded that he was working the gracilis muscle.[3] He did this for a few minutes, and Victim had another orgasm. When Victim's sister—who accompanied Victim to her appointment on this occasion—entered the room, Heath moved his hand away from Victim's vagina and massaged her thigh with two hands as he talked to her sister. Heath did not put his hand back on Victim's vagina while Victim's sister was in the room.

### Count 3—Sexual Battery

¶7 On December 1, 2012, Victim had her seventh visit with Heath, again after "convincing [herself] that everything was

---

3. "The gracilis muscle is a long, strap-like muscle that passes from the pubic bone to the tibia in the lower leg." Tim Barclay, *Gracilis Muscle*, Innerbody.com, https://www.innerbody.com/image_musfov/musc67-new.html [https://perma.cc/CGZ2-298E].

fine" and that she must have "imagined it." Heath started with a stomach massage, which was routine by this point, but then he went "lower and lower than ever before," with his fingers going past her waist "into [her] underpants." Victim was frozen. She did not say anything but felt Heath's fingers "stopping right on the left side of [her] vagina . . . where [her] leg starts." His fingers went "in a circular motion, which would move [the] outer lip of [Victim's] vagina over." At trial, Victim further described this as a touching of her labia majora, which she described as "the starting of the vagina, but not the . . . inner, not the opening, not the clit[oris]."

*Counts 4 & 5—Forcible Sexual Abuse and Object Rape*

¶8    Victim returned again on December 8, 2012. This visit was the same as the last. Heath went under Victim's underpants and moved his fingers in a circular motion, touching the "outer lip of [Victim's] vagina, moving it around and around and around." Then, Victim clearly felt Heath move one finger over (likely the pinky finger of Heath's right hand), and touch her "right on [her] clitoris . . . in the middle of [her] vagina." Victim flinched, and Heath moved his finger away.

¶9    Victim described this touching at trial. The prosecutor asked if Heath had to "go beyond the labia majora to touch [her] clitoris." Victim responded affirmatively. She similarly testified that she "felt" his finger "actually go beyond [her] labia majora."[4]

¶10    Victim did not immediately tell anyone what had happened because "if [she] said it out loud then it meant it was

---

4. Victim visited Heath one last time on December 15, 2012. Nothing relevant to the criminal case against Heath happened at that visit.

real and it really happened, and [she] didn't want to believe it." But a little more than a month later, Victim reported the touching to her mother and then to the police.

*Other Incidents with J.T. and E.B.*

¶11 Before Victim began visiting Heath in 2012, Heath was treating J.T. in 2011. J.T., a licensed massage therapist, visited Heath for hip and leg pain. Heath worked along the top of J.T.'s pubic bone and then started "grinding back and forth in [J.T.'s] crotch," touching and rubbing her clitoris. J.T. opened her eyes and saw that Heath "looked very different," "like he was . . . enjoying what he was doing." J.T. ended the appointment and never returned.

¶12 As a massage therapist, J.T. knew "there's absolutely no reason to" touch that area because there are "no muscles that attach right there." J.T. reported the incident to the police and the Division of Professional Licensing (DOPL). Though DOPL had some concerns, it declined to "investigate the matter any further" or "seek formal action against [Heath's] license." Heath had promised to examine and adjust his practices, and DOPL encouraged him to do so.

¶13 Then, in 2015, Heath treated E.B., who visited Heath a total of four times. On the third and fourth visits, Heath touched E.B.'s genital area, including the clitoris, over her clothes. At first it seemed unintentional, but throughout the treatment it became apparent to E.B. that it "was completely intentional" and that "there was no excuse for it." She too filed a complaint with DOPL and reported the incident to the police.

*Procedural History*

¶14 In 2015, the State charged Heath with sexual crimes against Victim and E.B. The charges with respect to each victim were severed, and the State filed an amended information

relating to the five sexual offenses against Victim: three counts of sexual battery, *see* Utah Code Ann. § 76-9-702.1 (LexisNexis 2017); one count of forcible sexual abuse, *see id.* § 76-5-404 (2012); and one count of object rape, *see id.* § 76-5-402.2 (2017).

¶15 Heath filed a motion in limine to exclude certain other acts evidence at trial, including testimony from J.T. and E.B., primarily under rule 404(b) of the Utah Rules of Evidence. Under a doctrine of chances theory, the trial court allowed the State to use J.T.'s and E.B.'s testimonies to prove mens rea but not to prove actus reus. When it came to proving actus reus, the court concluded that the State had "failed to prove the foundational requirement of frequency," which it described for purposes of the actus reus as "the frequency with which chiropractors are falsely accused of inappropriate touching during treatment." There was no evidence on this statistic, and the court reasoned that any conclusion on this point "would be nothing more than conjecture."

¶16 But regarding mens rea, the court found that the relevant inquiry was "the frequency of [Heath's] involvement in a type of event—the accidental touching of his patients' genitals." Reasoning that "the mistaken touching of another's genitals would be a once in a lifetime event" for the general population and that chiropractors could take precautions to avoid accidental touching that would make chiropractors as a class "indistinct from people generally," the court allowed the other acts evidence to prove mens rea—that is, to prove that Heath touched Victim not by mistake or accident incidental to treatment, but rather with the intent to arouse or gratify sexual desire.

¶17 Heath was tried before a jury. Among other witnesses, the State called a doctor of chiropractic (Doctor) to testify about the standard of care practiced by chiropractors in Utah. Doctor opined that chiropractors should "avoid any accidental,

incidental or intentional touching of sensitive areas" through "draping techniques" or "physical blockage." He also testified that there would be no medical reason to touch Victim below the "top of the pubic bone."

¶18 Heath testified in his own defense. As relevant here, he testified that he did not intentionally touch Victim's vaginal area but that incidental, over-the-clothing touching during the treatment was possible. He also stated that he was unaware that Victim had been sexually stimulated and that she gave no indication that she was uncomfortable. He admitted that there is no reason to intentionally touch a patient's labia or clitoris when treating lower back pain, whether under or over the clothing.

¶19 The jury found Heath guilty of all charges. After reviewing this court's decision in *State v. Patterson*, 2017 UT App 194, 407 P.3d 1002, the trial court on its own motion requested briefing on whether judgment should be arrested on count 5 on the basis that penetration of the genital opening may not have been established. Heath then filed his own motion to arrest judgment, contending that the evidence was insufficient on counts 4 and 5 for forcible sexual abuse and object rape. Specifically, he argued that the State did not prove "penetration" of the "genital or anal opening," as required by the object rape statute. *See* Utah Code Ann. § 76-5-402.2(1). He additionally argued that, for purposes of forcible sexual abuse, the State did not prove his specific intent "to arouse or gratify the sexual desire of any individual." *See id.* § 76-5-404(1).

¶20 The trial court rejected both arguments. It first stated that penetration "means entry between the outer folds of the labia" and concluded that the evidence was sufficient to show penetration, "meaning [Heath's] fingers entered between the outer folds of [Victim's] labia." It then determined that a reasonable jury could find specific intent for forcible sexual abuse, reasoning that the "nature, duration and progression of

the touching described by [Victim] all give rise to a reasonable inference" about Heath's intent to arouse or gratify sexual desire. The court also noted that there was "no medical purpose" for the touching. So concluding, the court declined to arrest judgment.

¶21 The trial court sentenced Heath to concurrent prison terms of up to one year on each sexual battery count, one to fifteen years for forcible sexual abuse, and five years to life for object rape. Heath appeals.

ISSUES AND STANDARDS OF REVIEW

¶22 Heath raises challenges to the admission of other acts evidence at trial, the sufficiency of the evidence on all counts, and the jury instructions.

¶23 Trial courts "are afforded a great deal of discretion in determining whether to admit or exclude evidence." *State v. Martin*, 2017 UT 63, ¶ 18, 423 P.3d 1254 (cleaned up). Barring an "error of law," we will reverse a trial court's evidentiary decision under rule 404(b) of the Utah Rules of Evidence "only if that decision is beyond the limits of reasonability." *Id.* (cleaned up); *see also State v. Thornton*, 2017 UT 9, ¶ 56, 391 P.3d 1016 ("[T]he question . . . is whether the [trial court] abused [its] broad discretion in [admitting rule 404(b) evidence].").

¶24 We review Heath's sufficiency challenges "under well-settled standards of review—yielding deference to the jury's determination of the sufficiency of the evidence but addressing the legal questions he raises de novo." *State v. Barela*, 2015 UT 22, ¶ 17, 349 P.3d 676 (cleaned up); *see also State v. Nielsen*, 2014 UT 10, ¶ 46, 326 P.3d 645 (stating that, in any sufficiency challenge, we "review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict" (cleaned up)).

¶25   In the instances where Heath's sufficiency challenges are unpreserved, he asks that we review them for plain error and ineffective assistance of counsel.[5] To prevail on plain error review, not only must Heath show "that the evidence was insufficient to support a conviction of the crime charged," he must also show "that the insufficiency was so obvious and fundamental that the trial court erred in submitting the case to the jury." *State v. Holgate*, 2000 UT 74, ¶ 17, 10 P.3d 346. "An example of an obvious and fundamental insufficiency is the case in which the State presents *no* evidence to support an essential element of a criminal charge." *State v. Prater*, 2017 UT 13, ¶ 28, 392 P.3d 398 (cleaned up). Further, "an ineffective assistance of counsel claim raised for the first time on appeal presents a question of law," *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (cleaned up), and to prevail on his ineffective assistance of counsel claims, Heath must demonstrate that counsel's failure to raise the sufficiency issues to the trial court's attention was both objectively deficient and prejudicial, *see State v. Guzman*, 2018 UT App 93, ¶ 55, 427 P.3d 401 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Among other things, the failure to raise futile motions or objections challenging the sufficiency of the evidence does not constitute ineffective assistance. *State v. Stringham*, 2013 UT App 15, ¶ 5, 295 P.3d 1170 (per curiam).

¶26   Finally, Heath's jury instruction challenge is unpreserved, and he seeks review only under the ineffective assistance of

---

5. Heath also asks that we review the unpreserved sufficiency claims for manifest injustice. As Heath acknowledges, "manifest injustice" is generally synonymous with "plain error," *see State v. Alinas*, 2007 UT 83, ¶ 10, 171 P.3d 1046, and Heath argues his sufficiency claims as though the two standards are synonymous. We accordingly follow suit.

counsel doctrine.[6] As explained above, to prevail on this challenge Heath must demonstrate that his counsel performed deficiently with respect to the jury instruction errors and that the deficient performance prejudiced him. *State v. Parkinson*, 2018 UT App 62, ¶ 9, 427 P.3d 246.

## ANALYSIS

### I. The Other Acts Evidence

¶27    Before trial, the court ruled that certain evidence would be admissible at trial under rule 404(b) of the Utah Rules of Evidence. This evidence included testimony from J.T. and E.B., statements Heath made in police interviews, a 2011 DOPL letter issued to Heath, and the 2014 DOPL probation and reprimand orders (collectively, the Other Acts Evidence).

¶28    As a general matter, rule 404(b) bars propensity evidence: "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular

---

6. In his opening brief, Heath additionally sought review of this issue under the plain error and manifest injustice doctrines. But he concedes in reply that he invited the error, and thus he abandons those doctrines and narrows his challenge to one for ineffective assistance of counsel. *See State v. Crespo*, 2017 UT App 219, ¶ 22 n.5, 409 P.3d 99 (noting that this court may not review a challenge to jury instructions for plain error if the error was invited); *see also State v. Geukgeuzian*, 2004 UT 16, ¶ 9, 86 P.3d 742 ("While a party who fails to object to or give an instruction may have an instruction assigned as error under the manifest injustice exception, a party cannot take advantage of an error committed at trial when that party led the trial court into committing the error."(cleaned up)).

occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). However, the evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2); *see also State v. Verde*, 2012 UT 60, ¶ 15, 296 P.3d 673 (explaining that this list is not exhaustive), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016.

¶29 Heath argues that the trial court erred in admitting the Other Acts Evidence at trial, raising two main challenges to its admission. First, he argues that the court erroneously admitted this evidence to prove mens rea. Second, he argues that the admission of this evidence allowed the State to derail the trial with "irrelevant and prejudicial evidence" and contends that the court should have required the jury to "decide the issue of guilt or innocence solely on the basis of the demeanor and testimony of [himself] and [Victim]."[7] We address each challenge in turn and ultimately reject them.

A.    Admitting the Other Acts Evidence to Prove Mens Rea

¶30 Heath argues that the trial court erred in admitting the Other Acts Evidence to prove mens rea, asserting two specific challenges to its admission for this purpose. First, he contends that the testimony of J.T. and E.B. should not have been admitted under the doctrine of chances exception to rule 404(b) because

---

7. Heath also argues that "the jury was never asked in the first instance to make the foundational factual determination that the conduct alleged by J.T. and E.B. was actually committed" and asserts that this was error. This claim, however, was not preserved, and Heath has not asked us to review it under an exception to the preservation rule. Thus, we do not address it further.

the State failed to establish the frequency element required under that exception. Second, he contends that the trial court erred in allowing the evidence to be admitted to prove the specific intent requirement of his offenses as opposed to "the general intent to commit the act."

1.     The Doctrine of Chances

¶31    The doctrine of chances is a unique analytical framework used to admit evidence of other acts that would otherwise be excluded by rule 404(b)(1). *See State v. Lane*, 2019 UT App 86, ¶ 18, 444 P.3d 553. The doctrine is "a theory of logical relevance that rests on the objective improbability of the same rare misfortune befalling one individual over and over." *Verde*, 2012 UT 60, ¶ 47 (cleaned up). The Utah Supreme Court has explained,

> As the number of improbable occurrences increases, the probability of coincidence decreases, and the likelihood that the defendant committed one or more of the actions increases. An innocent person may be falsely accused or suffer an unfortunate accident, but when several independent accusations arise or multiple similar accidents occur, the objective probability that the accused innocently suffered such unfortunate coincidences decreases. At some point, the fortuitous coincidence becomes too abnormal, bizarre, implausible, unusual or objectively improbable to be believed.

*Id.* ¶ 49 (cleaned up). "[F]or evidence to be admitted under the doctrine of chances, it must meet four foundational requirements: materiality, similarity, independence, and frequency." *State v. Lopez*, 2018 UT 5, ¶ 54, 417 P.3d 116. The requirement of frequency is at issue here.

¶32    The trial court carefully analyzed whether to admit the Other Acts Evidence concerning J.T. and E.B. under the doctrine of chances. It noted that the doctrine can be used to prove either the actus reus or the required mens rea. *See State v. Lowther*, 2017 UT 34, ¶¶ 23, 25, 398 P.3d 1032. And it concluded that the relative frequency required for application of the doctrine of chances depends on the purpose for which the doctrine is being used. *See* Edward J. Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove* Mens Rea*: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition*, 51 Ohio St. L.J. 575, 597 (1990) [hereinafter Imwinkelried]. "When the prosecutor invites the court to apply the doctrine to prove the actus reus, the focus is on the frequency of a particular type of loss—the death of a child in a person's custody or the fire at a person's building." *Id.*; *see also Verde*, 2012 UT 60, ¶ 61 & n.36 (relying on Imwinkelried in discussing the frequency requirement of the doctrine of chances). But "[w]hen the prosecutor asks the court to employ the doctrine to establish mens rea, the relevant frequency is the incidence of the accused's personal involvement in a type of event—the discharge of a weapon . . . , the possession of contraband drugs, or the receipt of stolen property." Imwinkelried at 597.

¶33    Here, the trial court allowed J.T.'s and E.B.'s testimonies to prove only mens rea—that Heath did not touch Victim's genitals accidentally. Thus, the question of frequency centered on Heath's personal "involvement in a type of event"—the accidental touching of his patients' genitals during treatment. In comparison to actus reus, where there is a greater likelihood that relevant statistical data will be available, a trial court "is more likely to have to rely on [its] common sense and knowledge of human experience" when determining the level of frequency for mens rea. Imwinkelried at 597–98.

¶34    In this regard, we agree with the trial court that the State satisfied the frequency requirement with respect to J.T.'s and

E.B.'s testimonies. As the trial court observed, "For the average person, the mistaken touching of another's genitals [of the nature at issue here] would be a once in a lifetime event." But Heath was accused of inappropriate touching of another's genitals by at least three people over roughly a five-year period. Though the trial court noted that "the frequency of unintended touching may be markedly higher" for chiropractors than those in the general population, it reasoned on the basis of testimony the State intended to (and did) present at trial that chiropractors could take precautions to avoid inappropriate touching that would make chiropractors "indistinct from people generally." In this respect, after the incident with J.T., DOPL sent a letter to Heath encouraging him to adjust his practices to avoid similar incidents in the future, yet Heath continued to be accused of inappropriate touching. Based on the DOPL letter, Heath knew the risks of inappropriate touching and the discomfort it caused his patients.

¶35　Moreover, frequency "interact[s] with" similarity "to become a safeguard against the doctrine of chances becoming a work-around for the admission of otherwise improper propensity evidence." *Lopez*, 2018 UT 5, ¶ 57. And here, the touching described by J.T. and E.B. was highly similar to the touching described by Victim. Each was a patient of Heath, and each described touching of her genital area, including the clitoris, during treatment. J.T. testified that Heath "grind[ed] back and forth in [her] crotch," while Victim testified that, on one occasion, Heath's hand went "up and down, back and forth, right over the seam of [her] yoga pants." Similar to E.B.'s testimony, the invasiveness of Heath's touching of Victim progressed in intensity from treatment to treatment, with Heath waiting until later visits to touch the genital area. While at first the touching seemed unintentional to E.B. and Victim, it became apparent to both of them as the visits progressed that Heath was touching their genitalia intentionally. As the trial court observed, the high degree of similarity between the incidents involving J.T.

and E.B. and those involving Victim simply made "a repeated mistake . . . less likely."

¶36 In these circumstances, we agree with the trial court that J.T.'s and E.B.'s testimonies were helpful in proving Heath's mens rea when he touched Victim. Accordingly, the trial court did not abuse its discretion in determining that the State had sufficiently shown the foundational requirement of frequency for purposes of admitting J.T.'s and E.B.'s testimonies under the doctrine of chances.

2.    Admission of the Other Acts Evidence for Specific Intent

¶37 Heath also challenges the admission of the Other Acts Evidence in general, contending that the trial court failed to limit the jury's use of the evidence to establishing only general intent. He argues that the evidence could perhaps be relevant to "counter a claim of mistake or accident for the touch" itself but that it had "no bearing on or relevance to the specific intent requirement" of the charged offenses. He thus asserts that the trial court erred by failing to limit the jury's consideration of the Other Acts Evidence to only countering a claim of mistaken or accidental touch.

¶38 We reject this argument. Heath fails to point us to any place in the record where he raised this issue—limiting the jury's consideration of the Other Acts Evidence to general rather than specific intent—to the trial court. *See Salt Lake City v. Josephson*, 2019 UT 6, ¶¶ 10–12, 435 P.3d 255 (setting forth the preservation doctrine and its underlying policies, which require a party to present the issue "to the trial court in such a way that the trial court has an opportunity to rule on that issue" (cleaned up)); *Holladay v. Storey*, 2013 UT App 158, ¶ 34, 307 P.3d 584 (stating that "it is not the appellate court's burden to comb through the record to verify whether, and where, [the appellant] preserved

this issue," and declining to address an issue raised on appeal on that basis); *see also* Utah R. App. P. 24(a)(5)(B).

¶39 Further, even assuming that this issue was preserved, Heath does not develop his argument with citation to authority and instead advances this point through conclusory statements about the trial court's supposed error. We decline to take up the burden of research and argument that would be necessary to resolve this issue. *See Cheek v. Iron County*, 2018 UT App 116, ¶¶ 24–25, 427 P.3d 522 (stating that "[a]n issue is inadequately briefed when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court," and concluding that the appellant had not carried her burden on appeal because "she ma[de] no attempt to present reasoned analysis supported by citations to legal authority," as required by our appellate rules (cleaned up)), *aff'd sub nom. Cheek v. Iron County Attorney*, 2019 UT 50, 448 P.3d 1236; *see also* Utah R. App. P. 24(a)(8).

B.    Weighing Probative Value Against Unfair Prejudice

¶40 Heath also challenges the Other Acts Evidence by asserting that the evidence was "only minimally relevant" and that its admission prejudiced him. Specifically, he contends that the "critical factual issue" for the jury was the respective credibility of Heath and Victim and that, accordingly, the jury should have been "required to decide the issue of guilt or innocence solely on the basis of [his and Victim's] demeanor and testimony." And by admitting the broad range of the Other Acts Evidence, Heath asserts, the trial court allowed the case to become "about everything and anything except for" proving the elements of the charged offenses.

¶41 Heath does not develop his argument that the probative value of the Other Acts Evidence was substantially outweighed by unfair prejudice. The trial court determined under rule 403 of

the Utah Rules of Evidence that the probative value of the Other Acts Evidence was not substantially outweighed by the danger of unfair prejudice or confusion of the issues, particularly where limiting instructions were available.[8] *See generally* Utah R. Evid. 403; *State v. Balfour*, 2018 UT App 79, ¶ 28, 418 P.3d 79 (explaining that, in deciding whether to admit other acts evidence, the trial court must determine whether that evidence satisfies rule 403). Heath challenges these determinations by labeling the State's case as weak and asserting that the trial court erred in allowing the State to hide that weakness by resorting to "distraction with innuendo and speculation," which forced him to "expend significant resources and trial time responding." But he does not otherwise explain why the trial court's rule 403 analysis was erroneous, why the limiting instructions failed to mitigate any potential in the evidence toward unfair prejudice, confusion, or distraction, or why any error in admitting the evidence was harmful. Thus, Heath has not carried his burden of persuasion on appeal. *See* Utah R. App. P. 24(a)(8); *Cheek*, 2018 UT App 116, ¶¶ 24–25.

¶42 In sum, we conclude that Heath has not demonstrated that the trial court exceeded "the limits of reasonability" when it admitted the State's rule 404(b) evidence. *See State v. Martin*, 2017 UT 63, ¶ 18, 423 P.3d 1254 (cleaned up). We thus affirm the court's evidentiary decision.

## II. Sufficiency of the Evidence

¶43 Heath contends that there was insufficient evidence to convict him of any of the charges brought against him. Below, we detail Heath's contentions with respect to each conviction, review the relevant statute, and recount the most important

---

8. To that end, limiting instructions were given to the jury for each piece of the Other Acts Evidence.

evidence presented at trial. We conclude that none of Heath's challenges require reversal of his convictions.

A.      Sexual Battery—Counts 1–3

¶44    Heath contends that the evidence at trial supporting the sexual battery counts "fail[ed] to demonstrate in any manner the element of [his] *knowledge* that his behavior would likely cause affront or alarm *to the person touched*." He asserts that he "always acted normal" and that Victim returned for treatment multiple times and "never once voiced any complaint or concern." He concedes that this particular sufficiency challenge was not preserved.

¶45    Utah Code section 76-9-702.1 defines the crime of sexual battery:

> A person is guilty of sexual battery if the person . . . intentionally touches, whether or not through clothing, the anus, buttocks, or any part of the genitals of another person, . . . and the actor's conduct is under circumstances the actor knows or should know will likely cause affront or alarm to the person touched.

Utah Code Ann. § 76-9-702.1(1) (LexisNexis 2017).[9]

¶46    The evidence presented at trial allowed the jury to find that Heath knew or should have known his actions would likely cause Victim affront or alarm. Heath had been personally advised that such touching is distressing. By the time he treated Victim in 2012, Heath had received a complaint from J.T. relating to the touching of her labia and a letter from DOPL instructing

---

9. Because there have been no material changes to this statute since the crimes occurred, we cite the current version.

him to adjust his practices and confirming his representation that he would adjust his practice to avoid any inappropriate touching of patients. Thus, Heath knew that his touching of J.T., which was similar to his touching of Victim, would likely cause affront or alarm.

¶47 Further, the evidence established that there was no medical purpose for the touching. Doctor testified at trial that chiropractors should "avoid any accidental, incidental or intentional touching" through various techniques and opined that there would have been no medical reason to touch Victim's genital area. Heath himself acknowledged that there is no clinical reason to intentionally touch a woman's genitalia when treating lower back pain. Despite this, Heath rubbed Victim's genitalia long enough for Victim to experience an orgasm on two occasions. Without any medical purpose for the touching, it was reasonable for the jury to conclude Heath knew or should have known that such touching would likely cause Victim—who was seeking treatment from Heath for her lower back pain—affront or alarm.

¶48 And contrary to Heath's argument, Victim did express some concern over Heath's conduct. The first time Heath started rubbing her genital area, Victim asked Heath what he was doing. Heath said he was massaging a psoas attachment. The next visit, Heath again started rubbing Victim's genital area. Victim again asked what he was doing, and Heath answered that he was working the gracilis muscle. When Victim's sister entered the room, Heath moved his hand away from Victim's genitalia and worked instead on Victim's thigh. This evidence further supports a reasonable inference that Heath knew or should have known his touching would likely affront or alarm Victim.

¶49 Finally, we reject Heath's contention that the jury could not reasonably conclude that he knew his touching would likely affront or alarm Victim because Victim returned for treatment.

As we recently explained in *State v. Jok*, 2019 UT App 138, 449 P.3d 610, victims of sexual abuse "display a diverse range of reactions to the harm they suffered," including confusion and disbelief. *Id.* ¶ 24. Given the varied possible responses to sexual abuse, Heath should have known—even with Victim's choice to return—that his touching of her genitalia was likely to cause affront or alarm. Victim was coming to Heath for treatment for lower back pain. She gave no indication that she welcomed the touching, and her inquiries to Heath suggested that she was trying to convince herself that the touching was medically appropriate.

¶50    In sum, the evidence was sufficient—or at least not so obviously insufficient that the trial court committed plain error "in submitting the case to the jury," *see State v. Holgate*, 2000 UT 74, ¶ 17, 10 P.3d 346—to find that Heath knew or should have known his massaging of Victim's vaginal area while purporting to treat lower back pain would likely cause Victim affront or alarm, *see* Utah Code Ann. § 76-9-702.1(1). Thus, we affirm Heath's three convictions for sexual battery.[10]

---

10. In addition to arguing plain error, Heath contends that defense counsel was ineffective for not recognizing the same alleged deficiencies in the State's evidence on the sexual battery counts. We reject Heath's contention and conclude for the reasons above either that any objection would have been futile, *see State v. Bell*, 2016 UT App 157, ¶ 22, 380 P.3d 11 ("Failing to file a futile motion does not constitute ineffective assistance of counsel." (cleaned up)), or that Heath has otherwise not shown that "no reasonable attorney" would have failed to object to the sufficiency of the evidence, *see State v. Roberts*, 2019 UT App 9, ¶ 29, 438 P.3d 885 ("Only when no reasonable attorney would pursue the chosen strategy will we determine that counsel has been constitutionally ineffective." (cleaned up)).

B.     Forcible Sexual Abuse—Count 4

¶51     Heath contends that there was insufficient evidence to support the count 4 conviction of forcible sexual abuse for two reasons: (1) the State failed to present evidence of specific intent to arouse or gratify anyone's sexual desire, and (2) the State failed to present evidence of Victim's nonconsent and Heath's mental state as to Victim's nonconsent.

¶52     At the time of the offenses, Utah Code section 76-5-404 defined the crime of forcible sexual abuse as follows:

> A person commits forcible sexual abuse if . . . under circumstances not amounting to . . . object rape, . . . the actor touches the anus, buttocks, or any part of the genitals of another, or touches the breast of a female, or otherwise takes indecent liberties with another, . . . with the intent to arouse or gratify the sexual desire of any individual, without the consent of the other . . . .

Utah Code Ann. § 76-5-404(1) (LexisNexis 2012).

1.     Specific Intent

¶53     Heath argues that while the jury was instructed as to the statute's requirement of specific intent to arouse or gratify sexual desire, "the State failed in presenting evidence of it." He asserts that he acted normally, he did not say anything of a sexual nature to Victim, and Victim "never gave any outward indication he was doing something wrong." He concludes that "the surrounding circumstances do not evidence the requisite specific intent" and that "the jury's verdict [was] based purely upon improper speculation."

¶54     "[P]roof of a defendant's intent is rarely susceptible of direct proof . . . ." *State v. Murphy*, 617 P.2d 399, 402 (Utah 1980).

Accordingly, circumstantial evidence has long been used to prove specific intent. *See State v. Garcia-Mejia*, 2017 UT App 129, ¶ 31, 402 P.3d 82; *see also State v. Kennedy*, 616 P.2d 594, 598 (Utah 1980) ("Wherever a special intent is an element of a criminal offense, its proof must rely on inference from surrounding circumstances."); *State v. Minousis*, 228 P. 574, 576 (Utah 1924) ("It is . . . well settled that . . . specific intent may be proved by circumstantial, as well as direct, evidence . . . ."). When circumstantial evidence is relied on to prove that element of an offense, we follow two steps:

> We must determine (1) whether the State presented any evidence that [the defendant] possessed the requisite intent, and (2) whether the inferences that can be drawn from that evidence have a basis in logic and reasonable human experience sufficient to prove that [the defendant] possessed the requisite intent.

*Holgate*, 2000 UT 74, ¶ 21 (cleaned up); *see also Garcia-Mejia*, 2017 UT App 129, ¶¶ 30–34 (applying these steps and holding that there was evidence of specific intent to arouse or gratify sexual desire despite the defendant not saying anything during his abusive interactions with his children).

¶55 First, we ask whether the State presented *any evidence* that Heath touched Victim with intent to arouse or gratify sexual desire. *See Garcia-Mejia*, 2017 UT App 129, ¶ 32. We conclude that it did. Victim explained the progression of Heath's treatment. On the fifth visit, Heath began to touch Victim over the clothes. By the seventh visit, Heath "put his hands in [Victim's] underpants" and did so again at the eighth visit on December 8. On December 8 specifically, Heath put his hands under her underpants and moved his fingers in a circular motion, moving the outer lip of Victim's vagina "around and around and around" for a few minutes. As the State points out,

Heath testified that treatment of the inner thigh could result only in incidental or accidental contact with the labia, but the touching Victim described was more than brief accidental or incidental touching. And according to Doctor, there was no medical reason for the touching and it could have been avoided through a number of relatively simple techniques. In addition, the State presented the Other Acts Evidence that, as shown, is relevant to Heath's intent. *Supra* ¶¶ 27–42. For example, the State presented J.T.'s and E.B.'s testimonies about similar incidents with Heath, which tended to prove Heath's mens rea with respect to the charged offenses under the doctrine of chances. And the State presented Heath's statements to police, the 2011 DOPL letter, and the 2014 DOPL report and order, which tended to rebut Heath's defense of mistaken or accidental touching.[11] *Id.*

¶56    Second, we must ask whether the inferences to be drawn from the State's evidence "have a basis in logic and reasonable human experience sufficient to prove that" Heath possessed the intent to arouse or gratify sexual desire. *See Garcia-Mejia*, 2017 UT App 129, ¶ 33 (cleaned up). Again, we conclude that they do. The nature, duration, and progression of Heath's touching of Victim all give rise to a reasonable inference, completely in line with human experience, that Heath acted with intent to arouse or gratify sexual desire. There was no medical reason for the touching, and Heath had been advised to take the necessary precautions to avoid it. Not only did Heath not take precautions with Victim, he touched Victim on several occasions, sometimes

---

11. The jury was instructed to consider the Other Acts Evidence as evidence of Heath's mental state at the time he treated Victim and as bearing on whether the charged acts were mistaken or accidental. As noted earlier, *supra* ¶¶ 37–39, Heath did not preserve any challenge to these instructions. Thus, we assume, for purposes of argument, that this evidence was properly considered.

for several minutes at a time. For example, he put his hand under her pants and moved the outer lip of her vagina "around and around and around." And on previous visits, Heath had rubbed Victim's genital area for several minutes, causing Victim to experience an orgasm. These facts lead to a reasonable inference that Heath's touching was not merely incidental to treatment of Victim's lower back. Thus, Heath has not persuaded us that no reasonable jury could find that he acted with specific intent "to arouse or gratify . . . sexual desire" when he touched Victim's genitalia for minutes at a time. *See* Utah Code Ann. § 76-5-404(1). We therefore decline to reverse Heath's conviction on count 4.

2. Victim's Nonconsent and Heath's Mental State Regarding Victim's Nonconsent

¶57 Heath also challenges his conviction for forcible sexual abuse on the grounds that "the State failed to prove non-consent" and that "Heath acted with the requisite mens rea as to any purported lack of consent." In doing so, he largely repeats his other arguments—Victim did not express a lack of consent, did not resist, returned for subsequent treatments, and gave no indication that she was uncomfortable. Further, he asserts that "[w]ithout having been informed by any verbal or non-verbal cues whatsoever indicating [Victim] was uncomfortable," he cannot have acted with the requisite mens rea as to Victim's nonconsent. These arguments were unpreserved.

¶58 Utah Code section 76-5-404 includes the victim's nonconsent as an element of forcible sexual abuse. Utah Code Ann. § 76-5-404(1) (LexisNexis 2012). And the code "requires proof . . . that [the defendant] had the requisite mens rea as to the victim's nonconsent." *See State v. Barela*, 2015 UT 22, ¶ 26, 349 P.3d 676. Nonconsent and, additionally, the defendant's mental state regarding nonconsent, "cannot be determined simply by

asking whether [the alleged victim] physically fought back or attempted to escape." *See State v. Cady*, 2018 UT App 8, ¶ 11, 414 P.3d 974 (cleaned up). Normally, consent (or the lack of it) "is a fact-intensive, context-dependent question, decided on a case-by-case basis." *Barela*, 2015 UT 22, ¶ 39. As such, the question of consent "has long [been] left . . . in the hands of the jury." *Id.*

¶59 Utah Code section 76-5-406 identifies a number of circumstances in which the crime of forcible sexual abuse "is without consent." Utah Code Ann. § 76-5-406(2) (LexisNexis Supp. 2019). One of these circumstances concerns health-care professionals, including chiropractors. *Id.* § 76-5-406(1)(a). An act of forcible sexual abuse "is without consent" if

> the actor is a health professional . . . , the act is committed under the guise of providing professional diagnosis, counseling, or treatment, and at the time of the act the victim reasonably believed that the act was for medically or professionally appropriate diagnosis, counseling, or treatment to the extent that resistance by the victim could not reasonably be expected to have been manifested.

*Id.* § 76-5-406(2)(*l*). Heath makes the conclusory assertion that the State did not establish that this health-professional circumstance applied. But he does not address the evidence showing that Heath was a chiropractor, Heath claimed to be treating Victim's psoas and gracilis muscles as he touched her genitalia, Victim trusted Heath because his treatments were helping, and Victim's mother had recommended Heath as a chiropractor—all evidence that supports the legal conclusion that Victim did not (and could not) consent under the health-professional circumstance. In short, Heath must show an "obvious and fundamental" insufficiency on questions that are particularly fact-intensive. *See Holgate*, 2000 UT 74, ¶ 17. And having failed to engage with this

evidence, he has not done so here.[12] We therefore affirm his conviction for forcible sexual abuse.[13]

C.     Object Rape—Count 5

¶60     Heath contends that the State failed to prove penetration of the genital opening for purposes of object rape. He asserts that Victim never used the word "penetration" and instead described Heath has having touched the "outer lip of [her] vagina"[14] and "on [her] clitoris." He argues that her clitoris is not the requisite "genital opening" contemplated by the object rape statute. In his view, the "genital opening" means the "vaginal opening," and he points to supposed contextual cues in the statute, particularly

_____

12. Heath also briefly argues that the State failed to prove that he acted with "the requisite mens rea as to any purported lack of consent" where the State did not present evidence showing that he was at least reckless with respect to Victim's nonconsent. However, the same evidence discussed above also supports a finding that Heath was at least reckless with respect to Victim's nonconsent.

13. Heath also makes an ineffective assistance of counsel claim with respect to his unpreserved arguments on count 4. Heath, however, has not shown that it was unreasonable under these circumstances for defense counsel to not object to the sufficiency of the evidence on the issues of nonconsent. *See Roberts*, 2019 UT App 9, ¶ 29. Accordingly we reject this argument.

14. Victim and counsel often referred to the "vagina" at trial when it is clear based on context that they intended to refer to the vulva—the external part of a female's genitalia. As Heath notes in his briefing on appeal, the term vagina is "quite often used colloquially to refer to the vulva" despite the fact that the vagina is part of a female's internal genitalia. (Cleaned up.)

the statute's use of the parallel term "anal opening," to support his interpretation.

¶61    Utah Code section 76-5-402.2 defines object rape as:

> A person who, without the victim's consent, causes the penetration, however slight, of the genital or anal opening of another person . . . by any foreign object, . . . including a part of the human body other than the mouth or genitals, . . . with the intent to arouse or gratify the sexual desire of any person, commits [object rape] . . . .

Utah Code Ann. § 76-5-402.2(1) (LexisNexis 2017).[15] "Penetration" was first defined by our case law in *State v. Simmons*, 759 P.2d 1152 (Utah 1988), in the context of rape of a child. *Id.* at 1153–54. The definition was then extended to object rape in *State v. Patterson*, 2017 UT App 194, 407 P.3d 1002. *Id.* ¶ 3. These cases hold that "penetration" in both the rape and object rape context means "entry between the outer folds of the labia."[16] *Id.* (cleaned up). In *Simmons*, our supreme court then

---

15. Because there have been no material changes to this statute since the crime occurred, we cite the current version.

16. It appears that numerous courts agree, holding that "entry of the anterior of the female genital organ, known as the vulva or labia, is sufficient penetration to constitute rape." James L. Rigelhaupt Jr., Annotation, *What Constitutes Penetration in Prosecution for Rape or Statutory Rape*, 76 A.L.R.3d 163 (1977); *see, e.g.*, *State v. Toohey*, 2012 SD 51, ¶ 22, 816 N.W.2d 120 (interpreting statutory language similar to Utah's "to mean that evidence of vulvar or labial penetration, however slight, is sufficient to prove penetration"); *State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001) (defining penetration and stating that "it is not

(continued…)

discerned insufficient evidence of penetration when the alleged victim testified only that the defendant "had placed his penis *on* her labial folds." 759 P.2d at 1154 n.1. *But see id.* at 1161 (Hall, C.J., concurring and dissenting) (stating that combined with other facts in the case this conclusion "insult[ed] common sense and the experience of all those sexually literate"). Conversely, in *Patterson*, we held that there was sufficient evidence of penetration when the victim testified that the defendant "tr[ied] to put his fingers up" her genitalia, that he "separated the labia" using two fingers, and that "[i]t really hurt." 2017 UT App 194, ¶¶ 8, 19.

¶62　Here, Victim testified that Heath's finger touched her "right on [her] clitoris . . . in the middle of [her] vagina." In response to questions, Victim clarified that Heath had to "go beyond [her] labia majora to touch [her] clitoris" and that she "felt" his finger "actually go beyond [her] labia majora." Elsewhere in her testimony, Victim described the labia majora as "the soft skin that's the starting of the vagina, but not the . . . inner, not the opening, not the clit[oris]."

¶63　Heath argues that this testimony was insufficient to prove that he penetrated Victim's genital opening. To do so, he contends that *Simmons* and *Patterson*'s "penetration" definition should not be credited. He points out that *Simmons* was a rape case, not an *object* rape case, and asserts that neither *Simmons* nor *Patterson* actually reviewed, interpreted, or "consider[ed] the specific requirement of the object rape statute to penetrate the

---

(…continued)

necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient" (cleaned up)). Though this secondary source and the cases it cites discuss rape and not object rape, the definition of "penetration" of the female genitalia is consistent.

genital or anal opening." Rather, according to Heath, *Patterson* merely imported the definition of "penetration" announced in *Simmons* without dealing with the fact that the rape statute and object rape statute differ with respect to the "*specific body part required to be penetrated.*"

¶64 To that end, Heath argues for a different interpretation of "penetration" in relation to the genital opening under section 76-5-402.2. He asserts that, properly construed, section 76-5-402.2's reference to "genital . . . opening" means "vaginal opening." He advances his conclusion by analogizing the reference in the statute of "genital opening" to that of the "anal opening," arguing that, when read in context, the "anal opening" means "the actual opening [where the gastrointestinal tract ends and exits the body] and not the surrounding skin and folds." Extending the analogy, Heath argues that "genital opening" must then mean the "vaginal opening" or, alternatively, the vaginal "hole." Thus, in his view, "an inappropriate touch of the clitoris or even an inappropriate touch of the protective skin and folds surrounding the clitoris and the vulva" may be sexual battery or forcible sexual abuse but it is not object rape, "because *no opening has been penetrated.*" We first address Heath's statutory construction argument, and we then address the sufficiency of the evidence supporting his conviction of object rape.

¶65 It is true that the rape and object rape statutes use slightly different terminology with respect to "penetration." The rape statute refers to "sexual penetration," Utah Code Ann. § 76-5-407(2)(a)(iii) (LexisNexis Supp. 2019), while the object rape statute refers to "penetration . . . of the genital or anal opening," *id.* § 76-5-402.2(1) (2017). And as Heath points out, neither *Simmons* nor *Patterson* interpreted the meaning of "penetration" specifically with respect to a "genital opening." However, we conclude that the plain meaning of the phrase "penetration . . . of the genital . . . opening" in section

76-5-402.2(1) is consistent with the definition of "penetration" announced in *Simmons* and applied in *Patterson*. We thereby reject Heath's proffered interpretation.

¶66   The "primary goal" of statutory interpretation "is to evince the true intent and purpose of the Legislature," and the "best evidence of the legislature's intent is the plain language of the statute itself." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (cleaned up). It is well-settled that in interpreting statutes we presume that "the legislature used each term advisedly according to its ordinary and usually accepted meaning," and that "the expression of one term should be interpreted as the exclusion of another." *Id.* (cleaned up); *see also State v. Sanders*, 2019 UT 25, ¶ 17, 445 P.3d 453 ("As we examine the text, we presume that the legislature used each word advisedly." (cleaned up)). *See generally State v. Robertson*, 2017 UT 27, ¶ 40, 438 P.3d 491 (stating that the judiciary is tasked with "interpreting and applying legislation according to what appears to be the legislature's intent, neither inferring substantive terms into the text that are not already there nor taking away from the statutory text by ignoring it or rendering it superfluous" (cleaned up)).

¶67   Heath's argument turns in part on the meaning of "opening" in the object rape statute; he asserts that "opening" in this context means a "specified anatomical *hole*." (Emphasis added.) But the ordinary dictionary meaning of the term "opening" is not so limited, and common synonyms include, among other things, a "gap," "vent," "breach," "space," and "slot." *See Opening*, Dictionary.com, https://www.dictionary.com/browse/opening?s=t [https://perma.cc/ST8P-SQXP]; *Opening*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/opening [https://perma.cc/EJ3W-55DZ]; *Opening*, Thesaurus.com, https://www.thesaurus.com/browse/opening?s=t [https://perma.cc/7Y8Q-D3QL]; *see also State v. Lambdin*, 2017 UT 46, ¶ 22, 424 P.3d 117 ("When interpreting statutes, we look

to the ordinary meaning of the words, using the dictionary as our starting point.").

¶68    Further, in the context of the object rape statute, it is plain that the term "opening" is not limited to the vaginal opening. *See Lambdin*, 2017 UT 46, ¶ 22 ("After determining our starting point [from the dictionary definitions], we then must look to the context of the language in question." (cleaned up)). The legislature used the term "*genital . . . opening*" in the object rape statute, not "vaginal opening." Utah Code Ann. § 76-5-402.2(1) (emphasis added). The term "genital" is broadly defined as "of or relating to the sexual organs." *Genital*, Dictionary.com, https://www.dictionary.com/browse/genital?s=t [https://perma.cc/9VBP-GFKE]; *Genital*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/genital [https://perma.cc/J6TR-LMLT] (defining "genital" as "of, relating to, or being a sexual organ"). And indeed, as the State points out, accepted medical understanding establishes that female genitalia have more than one opening, including the vaginal opening and the opening between the labial folds. *See* Jennifer Knudtson & Jessica E. McLaughlin, *Female External Genital Organs*, Merck Manual, https://www.merckmanuals.com/home/women-s-health -issues/biology-of-the-female-reproductive-system/female-extern al-genital organs [https://perma.cc/GD4X-P5LX] (identifying a female's external genital organs, including the various "openings," and explaining that the labia majora are "folds of tissue that enclose and protect the other external genital organs").

¶69    Given this, if the legislature intended to limit the meaning of "penetration" to only the *vaginal* opening, it could have done so. But it did not, and instead used the more inclusive term "genital opening"—a choice in terminology that we must presume was intentional. *See Marion Energy*, 2011 UT 50, ¶ 14. Because the plain meaning of the term "genital opening" necessarily includes more than simply the "vaginal opening,"

we disagree with Heath's assertion that, in context, the meaning of "genital opening" is strictly limited to the "vaginal opening." We also discern no other indication in the object rape statute that the legislature intended "genital opening" to be narrowly interpreted as "vaginal opening." Thus, we cannot read into the object rape statute the limitation that Heath urges. *See Robertson*, 2017 UT 27, ¶ 40. The statute's plain language simply does not support doing so.

¶70   The plain language reading of the term "genital opening" in the object rape statute is consistent with the interpretation of "penetration" decided in *Simmons* and applied in *Patterson*. The courts in both cases determined that the "penetration" element in the context of either rape or object rape is satisfied when the penetration occurs "between the outer folds of the labia." *Simmons*, 759 P.2d at 1154; *Patterson*, 2017 UT App 194, ¶ 3. Because the object rape statute uses the general and inclusive "genital opening" terminology, and because one of the medically acknowledged female genital openings is that between the labial folds, it follows that the penetration element is satisfied upon proof of entry "between the outer folds of the labia." *Simmons*, 759 P.2d at 1154; *Patterson*, 2017 UT App 194, ¶ 3. And Heath has not otherwise shown error in how the statute was interpreted in *Simmons* and *Patterson*.[17] Thus, we conclude that, in defining object rape, the legislature did not intend to limit the required penetration of the "genital opening" to the "vaginal opening" and that the interpretation of "penetration" set forth in *Simmons* and *Patterson* are in line with a plain language reading of the object rape statute.

---

17. We reiterate that numerous courts define penetration of the female genitalia this way. *See supra* note 16. Though of course not necessary to rule for Heath on his statutory argument, Heath cites no case in which a court has interpreted statutory language similar to Utah's to require penetration of the vaginal opening.

¶71 Next, having interpreted the relevant terms, resolving Heath's sufficiency challenge is straightforward. Victim explicitly testified that Heath went "beyond [her] labia majora to touch [her] clitoris" "in the middle of [her] vagina." Unlike in *Patterson*, in which the victim did not explicitly state that the defendant penetrated her genital opening and the jury had to rely on competing inferences, no inferences were required here. Victim testified directly to the question of penetration and, though not using that exact word, described Heath touching her clitoris and confirmed that he had to "go beyond [her] labia majora" to do so. Thus, the jury reasonably found that Heath penetrated Victim's genital opening when he touched her clitoris. *See* Utah Code Ann. § 76-5-402.2(1); *see also State v. Lerman*, 2018 MT 5, ¶ 13, 408 P.3d 1008 (holding that there was sufficient evidence of penetration based on "common sense anatomy" because "[t]he outer portions of the vulva necessarily are penetrated, however slightly, when the clitoris is touched" (cleaned up)); *Jett v. Commonwealth*, 510 S.E.2d 747, 749 (Va. Ct. App. 1999) ("[T]he clitoris lies within the labia majora; therefore, evidence of penetration or stimulation of the clitoris is sufficient to establish penetration of the labia majora . . . ."). We accordingly affirm his conviction for object rape.[18]

### III. Jury Instructions

¶72 Heath contends that he received ineffective assistance of counsel in regard to the jury instructions at his trial. We have no need to describe the challenges in detail. Heath paints with a

---

18. Heath challenges his conviction for object rape with the same argument he did with respect to his conviction for forcible sexual abuse—namely, that there was no evidence of his specific intent to arouse or gratify sexual desire. This argument fails for the same reasons discussed above. *See supra* ¶¶ 53–56.

broad and indiscriminate brush, and he has failed to meet his burden of demonstrating prejudice.

¶73    "To succeed on an ineffective assistance of counsel claim, [a defendant] must demonstrate that his trial counsel's performance was deficient and that he suffered prejudice as a result." *State v. Vallejo*, 2019 UT 38, ¶ 36, 449 P.3d 39 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). There is no need for us "to address both components of the inquiry," *id.* ¶ 40 (cleaned up), and courts often analyze prejudice without opining on any objective deficiency in the representation, *see Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); *State v. Reid*, 2018 UT App 146, ¶ 20, 427 P.3d 1261.

¶74    The burden to prove prejudice is on the defendant. *State v. Garcia*, 2017 UT 53, ¶¶ 36–37, 424 P.3d 171. And it is no light undertaking. *Id.* ¶ 44. The defendant must show that "but for the error, there is a reasonable probability that the verdict would have been more favorable to him." *State v. Apodaca*, 2019 UT 54, ¶ 50, 448 P.3d 1255 (cleaned up). "[A] mere potential effect on the outcome is not enough." *Id.* Rather, the defendant must show a "substantial" likelihood of a different result as a "demonstrable reality and not [merely as] a speculative matter." *State v. Nelson*, 2015 UT 62, ¶¶ 10, 28, 355 P.3d 1031 (cleaned up); *see also Apodaca*, 2019 UT 54, ¶ 50 (stating that the prejudice requirement "is a relatively high hurdle to overcome" in that "the likelihood of a different result must be substantial" (cleaned up)).

¶75    Heath has not met his burden of demonstrating prejudice. He asserts that the instructions were prejudicial because they were "incomplete, legally inaccurate, and confusing." But this does not establish prejudice. Even if the instructions were problematic, Heath must still show a prejudicial effect on the outcome given the totality of the evidence at trial. Considering

the evidence in this case—Victim's testimony, the Other Acts Evidence, Doctor's testimony, and Heath's own admissions—it is difficult to say that it is reasonably likely the jury would have come to a different conclusion had the instructions been different. At least, Heath has not hoed that row. We therefore conclude on this basis that there was no demonstrable ineffective assistance of counsel in regard to the jury instructions.[19]

CONCLUSION

¶76 The trial court did not abuse its discretion in admitting the Other Acts Evidence. Based in part on that evidence, there was sufficient evidence for the jury to convict Heath of sexual battery, forcible sexual abuse, and object rape. Finally, Heath's counsel was not constitutionally ineffective in not objecting to jury instructions because Heath has not shown prejudice from the lack of an objection. We affirm Heath's convictions.

––––––––––

19. Heath also argues that if we determine "that the errors set forth herein do not individually warrant reversal," we should "find the cumulative effect of all such errors do." But there are no errors to cumulate, and therefore cumulative error does not apply. *See State v. Squires*, 2019 UT App 113, ¶ 45 n.10, 446 P.3d 581.